**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 39 MAP 2020 |
| | : | |
| Appellee | : | Appeal from the Order of Superior |
| | : | Court at No. 3314 EDA 2018 dated |
| | : | December 10, 2019 Affirming the |
| v. | : | Judgment of Sentence dated |
| | : | September 25, 2018 of the |
| | : | Montgomery Court of Common |
| WILLIAM HENRY COSBY JR., | : | Pleas, Criminal Division, at No. CP- |
| | : | 46-CR-3932-2016 |
| Appellant | : | |
| | : | ARGUED: December 1, 2020 |

**OPINION**

**JUSTICE WECHT**                                              **DECIDED: June 30, 2021**

In 2005, Montgomery County District Attorney Bruce Castor learned that Andrea Constand had reported that William Cosby had sexually assaulted her in 2004 at his Cheltenham residence. Along with his top deputy prosecutor and experienced detectives, District Attorney Castor thoroughly investigated Constand's claim. In evaluating the likelihood of a successful prosecution of Cosby, the district attorney foresaw difficulties with Constand's credibility as a witness based, in part, upon her decision not to file a complaint promptly. D.A. Castor further determined that a prosecution would be frustrated because there was no corroborating forensic evidence and because testimony from other potential claimants against Cosby likely was inadmissible under governing laws of evidence. The collective weight of these considerations led D.A. Castor to conclude that, unless Cosby confessed, "there was insufficient credible and admissible

evidence upon which any charge against Mr. Cosby related to the Constand incident could be proven beyond a reasonable doubt."[1]

Seeking "some measure of justice" for Constand, D.A. Castor decided that the Commonwealth would decline to prosecute Cosby for the incident involving Constand, thereby allowing Cosby to be forced to testify in a subsequent civil action, under penalty of perjury, without the benefit of his Fifth Amendment privilege against self-incrimination.[2] Unable to invoke any right not to testify in the civil proceedings, Cosby relied upon the district attorney's declination and proceeded to provide four sworn depositions. During those depositions, Cosby made several incriminating statements.

D.A. Castor's successors did not feel bound by his decision, and decided to prosecute Cosby notwithstanding that prior undertaking. The fruits of Cosby's reliance upon D.A. Castor's decision—Cosby's sworn inculpatory testimony—were then used by D.A. Castor's successors against Cosby at Cosby's criminal trial. We granted allowance of appeal to determine whether D.A. Castor's decision not to prosecute Cosby in exchange for his testimony must be enforced against the Commonwealth.[3]

## I. Factual and Procedural History

In the fall of 2002, Constand, a Canadian-born former professional basketball player, was employed as the Director of Basketball Operations at Temple University. It was in this capacity that Constand first met Cosby, who had close ties to, and was heavily

---

[1]    Notes of Testimony ("N.T."), *Habeas Corpus* Hearing, 2/2/2016, at 60.

[2]    *Id.* at 63.

[3]    As we discuss in more detail below, at Cosby's trial, the trial court permitted the Commonwealth to call five witnesses who testified that Cosby had engaged in similar sexually abusive patterns with each of them. We granted allowance of appeal here as well to consider the admissibility of that prior bad act evidence pursuant to Pa.R.E. 404(b). However, because our decision on the Castor declination issue disposes of this appeal, we do not address the Rule 404(b) claim.

involved with, the university. That fall, she, along with a few other Temple administrators, showed Cosby around the university's then-recently renovated basketball facilities. Over the course of several telephone conversations concerning the renovations, Cosby and Constand developed a personal relationship.

Soon after this relationship began, Cosby invited Constand to his Cheltenham residence. When Constand arrived, Cosby greeted her, escorted her to a room, and left her alone to eat dinner and drink wine. Cosby later returned, sat next to Constand on a couch, and placed his hand on her thigh. Constand was not bothered by Cosby's advance, even though it was the first time that any physical contact had occurred between the two. Shortly thereafter, Constand left the residence.

As the personal nature of the relationship progressed, Cosby eventually met Constand's mother and sister, both of whom attended one of Cosby's comedy performances. Soon thereafter, Cosby invited Constand to return to his home for dinner. Constand arrived at the residence and again ate alone, in the same room in which she had eaten during her first visit. When Constand finished eating, Cosby approached and sat next to her on the couch. At first, the two discussed Constand's desire to work as a sports broadcaster, but Cosby soon attempted physical contact. Cosby reached over to Constand and attempted to unbutton her pants. When she leaned forward to prevent him from doing so, Cosby immediately ceased his efforts. Constand believed that her actions had communicated to Cosby clearly that she did not want to engage in a physical relationship with him. She expected that no further incidents like this one would occur.

Toward the end of 2003, Cosby invited Constand to meet at the Foxwoods Casino in Connecticut. Constand accepted the invitation and, once at the casino, dined with Cosby and a casino employee, Tom Cantone. After dinner, Cantone walked Constand to her hotel room. Cosby called Constand and asked her to meet him for dessert in his

room. Constand agreed. When she arrived, she sat on the edge of Cosby's bed as the two discussed their customary topics: Temple athletics and sports broadcasting. Cosby then reclined on the bed next to Constand. Eventually, he drifted off to sleep. After remaining in Cosby's room for a few minutes, Constand left and returned to her own room. Constand interpreted Cosby's actions as another sexual overture. Notwithstanding these unwelcome advances, Constand still regarded Cosby as a mentor, remained grateful for his career advice and assistance, and did not feel physically threatened or intimidated.[4]

Eventually, Constand decided to leave her job at Temple and return to Canada to work as a masseuse. In January 2004, Constand went to Cosby's Cheltenham residence to discuss that decision. As on her previous visits to Cosby's home, Constand entered through the kitchen door. On this occasion, however, Constand noticed that Cosby already had placed a glass of water and a glass of wine on the kitchen table. While she sat at the table with Cosby and discussed her future, Constand initially chose not to sample the wine because she had not yet eaten and did not want to consume alcohol on an empty stomach. At Cosby's insistence, however, Constand began to drink.

At one point, Constand rose to use the restroom. When she returned, Cosby was standing next to the kitchen table with three blue pills in his hand. He reached out and offered the pills to Constand, telling her that the pills were her "friends," and that they would "help take the edge off."[5] Constand took the pills from Cosby and swallowed them. The two then sat back down and resumed their discussion of Constand's planned departure from Temple.

Constand soon began experiencing double vision. Her mouth became dry and she slurred her speech. Although Constand could not immediately identify the source of

---

[4]     N.T., Trial, 4/13/2018, at 53, 55.

[5]     N.T., Trial, 4/13/2018, at 59-60.

her sudden difficulties, she knew that something was wrong. Cosby tried to reassure her. He told her that she had to relax. When Constand attempted to stand up, she needed Cosby's assistance to steady herself. Cosby guided her to a sofa in another room so that she could lie down. Constand felt weak and was unable to talk. She started slipping out of consciousness.

Moments later, Constand came to suddenly, finding Cosby sitting behind her on the sofa. She remained unable to move or speak. With Constand physically incapable of stopping Cosby or of telling him to stop, Cosby began fondling her breasts and penetrating her vagina with his fingers. Cosby then took Constand's hand and used it to masturbate himself. At some point, Constand lost consciousness.

When Constand eventually awakened on Cosby's couch in the early morning hours, she discovered that her pants were unzipped and that her bra was raised and out of place. Constand got up, adjusted her clothing, and prepared to leave the residence. She found Cosby standing in a doorway, wearing a robe and slippers. Cosby told Constand that there was a muffin and a cup of tea on a table for her. She took a sip of the tea, broke off a piece of the muffin, and left.

After the January 2004 incident, Constand and Cosby continued to talk over the telephone about issues involving Temple University athletics. In March of that year, Cosby invited Constand to dinner at a Philadelphia restaurant. She accepted the invitation in hopes of confronting Cosby about the January episode, but the two did not discuss that matter during dinner. Afterward, Cosby invited Constand to his residence. She agreed. Once there, Constand attempted to broach the subject by asking Cosby to identify the pills that he had provided to her. She then tried to ask him why he took advantage of her when she was under the influence of those pills. Cosby was evasive and would not respond directly. Realizing that Cosby was not going to answer her

questions, Constand got up and left. She did not report to the authorities what Cosby had done to her.

A few months later, Constand moved back to her native Canada. She spoke with Cosby over the telephone, mostly about an upcoming Toronto performance that he had scheduled. Cosby invited Constand and her family to the show, which especially excited Constand's mother, who had attended two of Cosby's other performances and who brought a gift for Cosby to the show.

Constand kept the January 2004 incident to herself for nearly a year, until one night in January 2005, when she bolted awake crying and decided to call her mother for advice. Initially, Constand's mother could not talk because she was en route to work, but she returned Constand's call immediately upon arrival. During the call, Constand told her mother that Cosby had sexually assaulted her approximately one year earlier. Together, the two decided that the best course of action was to contact the Durham Regional Police Department in Ontario, Canada, and to attempt to retain legal counsel in the United States.

That night, Constand filed a police report with the Durham Regional Police Department. Shortly thereafter, Constand called Cosby, but he did not answer his phone. When Cosby returned the call the next day, both Constand and her mother were on the line. Constand brought up the January 2004 incident and asked Cosby to identify the three blue pills that he had given to her that night. Cosby apologized vaguely. As to the pills, Cosby feigned ignorance, promising Constand that he would check the label on the prescription bottle from which they came and relay that information to her.

Frustrated, Constand left the call, but her mother remained on the line and continued to speak with Cosby. Cosby assured Constand's mother that he did not have sexual intercourse with Constand while she was incapacitated. Neither Constand nor her

mother informed Cosby that Constand had filed a police report accusing him of sexual assault.

Constand later telephoned Cosby again and, unbeknownst to Cosby, recorded the conversation with a tape recorder that she had purchased. During this conversation, Cosby offered to continue assisting Constand if she still desired to work in sports broadcasting. He also indicated that he would pay for Constand to continue her education. Cosby asked Constand to meet him in person to discuss these matters further, and told her that he would have someone contact her to set up the meeting. As with the previous call, Cosby again refused to identify the pills that he had provided to Constand on the night of the alleged assault.

Within days of filing the police report, Constand received two telephone messages from people associated with Cosby. The first message was from one of Cosby's assistants, calling on Cosby's behalf to invite Constand and her mother to Cosby's upcoming performance in Miami, Florida. Constand called the representative back and recorded the call. The representative asked for certain details about Constand and her mother so that he could book flights and hotel rooms for them. Constand declined the offer and did not provide the requested information. Constand then received a message from one of Cosby's attorneys, who stated that he was calling to discuss the creation of a trust that Cosby wanted to set up in order to provide financial assistance for Constand's education. Constand never returned the attorney's call.

In the meantime, the Durham Regional Police Department referred Constand's police report to the Philadelphia Police Department, which, in turn, referred it to the Cheltenham Police Department in Montgomery County, where Cosby's residence was located. The case was assigned to Sergeant Richard Schaeffer, who worked in tandem

with the Montgomery County Detective Bureau and the Montgomery County District Attorney's Office to investigate Constand's allegation.

Sergeant Schaeffer first spoke with Constand by telephone on January 19, 2005. According to Sergeant Schaeffer, Constand seemed nervous throughout this brief initial interview. Thereafter, Constand traveled from Canada to Cheltenham to meet with the investigating team in person. Because this was Constand's first time meeting with law enforcement personnel, she felt nervous and uncomfortable while discussing with them the intimate nature of her allegations.

On January 24, 2005, then-Montgomery County District Attorney Bruce Castor issued a press release informing the public that Cosby was under investigation for sexual assault. Sergeant Schaeffer and other law enforcement officials interviewed Cosby in New York City, utilizing a written question and answer format. Cosby was accompanied by his attorneys, Walter M. Phillips, Esquire, and John P. Schmitt, Esquire. Cosby reported that Constand had come to his home at least three times during their social and romantic relationship. Cosby claimed that, on the night in question, Constand came to his house complaining of an inability to sleep. Cosby stated that he told Constand that, when he travels, he takes Benadryl, an antihistamine, which immediately makes him drowsy. According to Cosby, he then handed Constand one-and-a-half Benadryl pills, but did not tell her what they were.

Cosby recalled that, once Constand ingested the pills, they kissed and touched each other on the couch. Cosby admitted that he touched Constand's breasts and vagina, but he insisted that she neither resisted nor told him to stop. Additionally, Cosby told the investigators that he never removed his clothing and that Constand did not touch any part of his body under his clothes. Cosby denied having sexual intercourse with Constand and disclaimed any intent to do so that night. In fact, Cosby claimed that the two never

had sexual intercourse on any occasion. Cosby admitted that he told Constand and her mother that he would write down the name of the pills and provide them that information, but he acknowledged that he never actually did so. After the interview—and without being asked to do so—Cosby provided the police with pills, which laboratory testing confirmed to be Benadryl.

In February 2005, then-District Attorney Castor reviewed Constand's interviews and Cosby's written answers in order to assess the viability of a prosecution of Cosby. The fact that Constand had failed to promptly file a complaint against Cosby troubled the district attorney. In D.A. Castor's view, such a delay diminished the reliability of any recollections and undermined the investigators' efforts to collect forensic evidence. Moreover, D.A. Castor identified a number of inconsistences in Constand's various statements to investigators. After Cosby provided his written answers, police officers searched his Cheltenham residence and found no evidence that, in their view, could be used to confirm or corroborate Constand's allegations. Following the search of Cosby's home, Constand was interviewed by police again. D.A. Castor noted that there were inconsistences in that interview, which further impaired Constand's credibility in his eyes. He also learned that, before she contacted the police in Canada, Constand had contacted civil attorneys in Philadelphia, likely for the purpose of pursuing financial compensation in a lawsuit against Cosby.

Additionally, according to D.A. Castor, Constand's behavior in the year since the alleged assault complicated any effort to secure a conviction against Cosby. As evidenced by the number of telephone calls that she recorded, Constand continued to talk with Cosby on the phone, and she also continued to meet with him in person after the incident. D.A. Castor found these recurring interactions between a complainant and an alleged perpetrator to be atypical. D.A. Castor also reasoned that the recordings likely

were illegal and included discussions that could be interpreted as attempts by Constand and her mother to get Cosby to pay Constand so that she would not contact the authorities. The totality of these circumstances ultimately led D.A. Castor to conclude that "there was insufficient credible and admissible evidence upon which any charge against [] Cosby related to the Constand incident could be proven beyond a reasonable doubt." N.T., 2/2/2016, at 60.

Having determined that a criminal trial likely could not be won, D.A. Castor contemplated an alternative course of action that could place Constand on a path to some form of justice. He decided that a civil lawsuit for money damages was her best option. To aid Constand in that pursuit, "as the sovereign," the district attorney "decided that [his office] would not prosecute [] Cosby," believing that his decision ultimately "would then set off the chain of events that [he] thought as a Minister of Justice would gain some justice for Andrea Constand." *Id.* at 63-64. By removing the threat of a criminal prosecution, D.A. Castor reasoned, Cosby would no longer be able in a civil lawsuit to invoke his Fifth Amendment privilege against self-incrimination for fear that his statements could later be used against him by the Commonwealth. Mr. Castor would later testify that this was his intent:

> The Fifth Amendment to the United States Constitution states that a person may not be compelled to give evidence against themselves. So you can't subpoena somebody and make them testify that they did something illegal—or evidence that would lead someone to conclude they did something illegal—on the threat of if you don't answer, you'll be subject to sanctions because you're under subpoena.
>
> So the way you remove that from a witness is—if you want to, and what I did in this case—is I made the decision as the sovereign that Mr. Cosby would not be prosecuted no matter what. As a matter of law, that then made it so that he could not take the Fifth Amendment ever as a matter of law.
>
> So I have heard banter in the courtroom and in the press the term "agreement," but everybody has used the wrong word. I told [Cosby's attorney at the time, Walter] Phillips that I had decided that, because of

defects in the case, that the case could not be won and that I was going to make a public statement that we were not going to charge Mr. Cosby.

I told him that I was making it as the sovereign Commonwealth of Pennsylvania and, in my legal opinion, that meant that Mr. Cosby would not be allowed to take the Fifth Amendment in the subsequent civil suit that Andrea Constand's lawyers had told us they wanted to bring.

[Attorney] Phillips agreed with me that that is, in fact, the law of Pennsylvania and of the United States and agreed that if Cosby was subpoenaed, he would be required to testify.

But those two things were not connected one to the other. Mr. Cosby was not getting prosecuted at all ever as far as I was concerned. And my belief was that, as the Commonwealth and the representative of the sovereign, that I had the power to make such a statement and that, by doing so, as a matter of law Mr. Cosby would be unable to assert the Fifth Amendment in a civil deposition.

[Attorney] Phillips, a lawyer of vastly more experience even than me—and I had 20 years on the job by that point—agreed with my legal assessment. And he said that he would communicate that to the lawyers who were representing Mr. Cosby in the pending civil suit.

*Id.* at 64-66. Recalling his thought process at the time, the former district attorney further emphasized that it was "absolutely" his intent to remove "for all time" the possibility of prosecution, because "the ability to take the Fifth Amendment is also for all time removed." *Id.* at 67.

Consistent with his discussion with Attorney Phillips, D.A. Castor issued another press release, this time informing the public that he had decided not to prosecute Cosby. The press release stated, in full:

Montgomery County District Attorney Bruce L. Castor, Jr. has announced that a joint investigation by his office and the Cheltenham Township Police Department into allegations against actor and comic Bill Cosby is concluded. Cosby maintains a residence in Cheltenham Township, Montgomery County.

A 31 year old female, a former employee of the Athletic Department of Temple University complained to detectives that Cosby touched her inappropriately during a visit to his home in January of 2004. The woman reported the allegation to police in her native Canada on January 13, 2005.

Canadian authorities, in turn, referred the complaint to Philadelphia Police. Philadelphia forwarded the complaint to Cheltenham Police. The District Attorney's Office became involved at the request of the Cheltenham Chief of Police John Norris.

Everyone involved in this matter cooperated with investigators including the complainant and Mr. Cosby. The level of cooperation has helped the investigation proceed smoothly and efficiently. The District Attorney commends all parties for their assistance.

The District Attorney has reviewed the statements of the parties involved, those of all witnesses who might have first hand knowledge of the alleged incident including family, friends and co-workers of the complainant, and professional acquaintances and employees of Mr. Cosby. Detectives searched Mr. Cosby's Cheltenham home for potential evidence. Investigators further provided District Attorney Castor with phone records and other items that might have evidentiary value. Lastly, the District Attorney reviewed statements from other persons claiming that Mr. Cosby behaved inappropriately with them on prior occasions. However, the detectives could find no instance in Mr. Cosby's past where anyone complained to law enforcement of conduct, which would constitute a criminal offense.

After reviewing the above and consulting with County and Cheltenham detectives, the District Attorney finds insufficient, credible, and admissible evidence exists upon which any charge against Mr. Cosby could be sustained beyond a reasonable doubt. In making this finding, the District Attorney has analyzed the facts in relation to the elements of any applicable offenses, including whether Mr. Cosby possessed the requisite criminal intent. In addition, District Attorney Castor applied the Rules of Evidence governing whether or not evidence is admissible. Evidence may be inadmissible if it is too remote in time to be considered legally relevant or if it was illegally obtained pursuant to Pennsylvania law. After this analysis, the District Attorney concludes that a conviction under the circumstances of this case would be unattainable. As such, District Attorney Castor declines to authorize the filing of criminal charges in connection with this matter.

Because a civil action with a much lower standard for proof is possible, the District Attorney renders no opinion concerning the credibility of any party involved so as to not contribute to the publicity and taint prospective jurors. The District Attorney does not intend to expound publicly on the details of his decision for fear that his opinions and analysis might be given undue weight by jurors in any contemplated civil action. District Attorney Castor cautions all parties to this matter that he will reconsider this decision should the need arise. Much exists in this investigation that could be used (by others) to portray persons on both sides of the issue in a less than flattering

light. The District Attorney encourages the parties to resolve their dispute from this point forward with a minimum of rhetoric.

Press Release, 2/17/2005; N.T., 2/2/2016, Exh. D-4.

D.A. Castor did not communicate to Constand or her counsel his decision to permanently forego prosecuting Cosby. In fact, Constand did not learn of the decision until a reporter appeared at one of her civil attorney's offices later that evening. With the resolution of her allegations removed from the criminal courts, Constand turned to the civil realm. On March 8, 2005, less than one month after the district attorney's press release, Constand filed a lawsuit against Cosby in the United States District Court for the Eastern District of Pennsylvania.[6]

During discovery in that lawsuit, Cosby sat for four depositions. Cosby's attorney for the civil proceedings, John Schmitt, had learned about the non-prosecution decision from Cosby's criminal counsel, Walter Phillips. From the perspective of Cosby's attorneys, the district attorney's decision legally deprived Cosby of any right or ability to invoke the Fifth Amendment. Accordingly, not once during the four depositions did Cosby invoke the Fifth Amendment or even mention it. During one deposition, Attorney Schmitt advised Cosby not to answer certain questions pertaining to Constand, but he did not specifically invoke the Fifth Amendment.[7] Nor did Cosby claim the protections of the Fifth Amendment when asked about other alleged victims of his sexual abuse, presumably because he believed that he no longer retained that privilege. In fact, no one involved with either side of the civil suit indicated on the record a belief that Cosby could be prosecuted in the future. D.A. Castor's decision was not included in any written stipulations, nor was it reduced to writing.

---

[6]     *See Constand v. Cosby*, Docket No. 2:05-cv-01099-ER.

[7]     Constand's attorneys subsequently filed a motion to compel Cosby to answer.

At deposition, Cosby testified that he developed a romantic interest in Constand as soon as he met her, but did not reveal his feelings. He acknowledged that he always initiated the in-person meetings and visits to his home. He also stated that he engaged in consensual sexual activity with Constand on three occasions, including the January 2004 incident.

Throughout the depositions, Cosby identified the pills that he provided to Constand in 2004 as Benadryl. Cosby claimed to know the effects of Benadryl well, as he frequently took two of the pills to help himself fall asleep. Thus, when Constand arrived at his house on the night in question stressed, tense, and having difficulty sleeping, Cosby decided to give her three half-pills of Benadryl to help her relax. According to Cosby, Constand took the pills without asking what they were, and he did not volunteer that information to her.

Cosby explained that, after fifteen or twenty minutes, he suggested that they move from the kitchen to the living room, where Constand met him after going to the restroom. Cosby testified that Constand sat next to him on the couch and they began kissing and touching each other. According to Cosby, they laid together on the couch while he touched her breasts and inserted his fingers into her vagina. Afterwards, Cosby told her to try to get some sleep, and then he went upstairs to his bedroom. He came back downstairs two hours later to find Constand awake. He then escorted her to the kitchen where they had a muffin and tea.

Cosby was questioned about his telephone conversations with Constand's mother. Cosby admitted that he told Constand and her mother that he would write down the name of the pills that he gave her and then send it to them, but that he failed to do so. He further explained that he would not admit what the pills were over the phone with Constand and her mother because he did not want Constand's mother to think that he was a perverted old man who had drugged her daughter. He also noted that he had suspected that the

phone calls were being recorded. Although he did not believe that Constand was making these allegations in an attempt to get money from him, Cosby explained that, after Constand and her mother confronted him, he offered to pay for her education and asked his attorney to commence discussions regarding setting up a trust for that purpose. Cosby admitted that it would be in his best interests if the public believed that Constand had consented to the encounter, and that he believed he would suffer financial consequences if the public believed that he had drugged and assaulted her.

Notably, during his depositions, Cosby confessed that, in the past, he had provided Quaaludes[8]—not Benadryl—to other women with whom he wanted to have sexual intercourse.

Eventually, Constand settled her civil suit with Cosby for $3.38 million.[9] Initially, the terms of the settlement and the records of the case, including Cosby's depositions, were sealed. However, following a media request, the federal judge who presided over the civil suit unsealed the records in 2015.

By that point, then-D.A. Castor had moved on from the district attorney's office and was serving as a Montgomery County Commissioner. He was succeeded as district attorney by his former first assistant, Risa Vetri Ferman, Esquire.[10] Despite her predecessor's decision not to prosecute Cosby, upon release of the civil records, District Attorney Ferman reopened the criminal investigation of Constand's allegations. Then-

---

[8] "Quaalude" is a brand name for methaqualone, a central nervous system depressant that was a popular recreational drug from the 1960s through the 1980s, until the federal government classified methaqualone as a controlled substance.

[9] Constand also received $20,000 from American Media, Inc., which was a party to the lawsuit as a result of an interview that Cosby gave to the National Enquirer about Constand's allegations.

[10] D.A Ferman, now Judge Ferman, was subsequently elected to a seat on the Court of Common Pleas of Montgomery County.

First Assistant District Attorney Kevin R. Steele[11] was present during the initial stages of the newly-revived investigation and participated in early discussions with Cosby's new lawyers, Brian J. McMonagle, Esquire, and Patrick J. O'Conner, Esquire.

On September 23, 2015, upon learning that D.A. Ferman had reopened the case, former D.A. Castor sent her an email, to which he attached his February 17, 2005 press release, stating the following:

> Dear Risa,
>
> I certainly know better than to believe what I read in the newspaper, and I have witnessed first hand your legal acumen. So you almost certainly know this already. I'm writing to you just in case you might have forgotten what we did with Cosby back in 2005. Attached is my opinion from then.
>
> Once we decided that the chances of prevailing in a criminal case were too remote to make an arrest, I concluded that the best way to achieve justice was to create an atmosphere where [Constand] would have the best chance of prevailing in a civil suit against Cosby. With the agreement of [Attorney] Phillips and [Constand's] lawyers, I wrote the attached as the ONLY comment I would make while the civil case was pending. Again, with the agreement of the defense lawyer and [Constand's] lawyers, I intentionally and specifically bound the Commonwealth that there would be no state prosecution of Cosby in order to remove from him the ability to claim his Fifth Amendment protection against self-incrimination, thus forcing him to sit for a deposition under oath. [Attorney Phillips] was speaking for Cosby's side at the time, but he was in contact with Cosby's civil lawyers who did not deal with me directly that I recall. I only discovered today that [Attorney Phillips] had died. But those lawyers representing [Constand] civilly, whose names I did not remember until I saw them in recent media accounts, were part of this agreement because they wanted to make Cosby testify. I believed at the time that they thought making him testify would solidify their civil case, but the only way to do that was for us (the Commonwealth) to promise not to prosecute him. So in effect, that is what I did. I never made an important decision without discussing it with you during your tenure as First Assistant.
>
> Knowing the above, I can see no possibility that Cosby's deposition could be used in a state criminal case, because I would have to testify as to what happened, and the deposition would be subject to suppression. I cannot

---

[11]     Mr. Steele has since been elected District Attorney of Montgomery County.

believe any state judge would allow that deposition into evidence, nor anything derived therefrom. In fact, that was the specific intent of all parties involved including the Commonwealth and the plaintiff's lawyers. Knowing this, unless you can make out a case without that deposition and without anything the deposition led you to, I think Cosby would have an action against the County and maybe even against you personally. That is why I have publically suggested looking for lies in the deposition as an alternative now that we have learned of all these other victims we did not know about at the time we had made the go, no-go decision on arresting Cosby. I publically suggested that the DA in California might try a common plan scheme or design case using [Constand's] case as part of the *res gestae* in their case. Because I knew Montgomery County could not prosecute Cosby for a sexual offense, if the deposition was needed to do so. But I thought the DA in California might have a shot because I would not have the power to bind another state's prosecutor.

Some of this, of course, is my opinion and using Cosby's deposition in the CA case, might be a stretch, but one thing is fact: the Commonwealth, defense, and civil plaintiff's lawyers were all in the agreement that the attached decision from me stripped Cosby of this Fifth Amendment privilege against self-incrimination, forcing him to be deposed. That led to Cosby paying [Constand] a lot of money, a large percentage of which went to her lawyers on a contingent fee basis. In my opinion, those facts will render Cosby's deposition inadmissible in any prosecution in Montgomery County for the incident that occurred in January 2004 in Cheltenham Township.

Bruce

N.T., 2/2/2016, Exh. D-5.

Replying by letter, D.A. Ferman asserted that, despite the public press release, this was the first she had learned about a binding understanding between the Commonwealth and Cosby. She requested a copy of any written agreement not to prosecute Cosby. D.A. Castor replied with the following email:

The attached Press Release is the written determination that we would not prosecute Cosby. That was what the lawyers for [Constand] wanted and I agreed. The reason I agreed and the plaintiff's lawyers wanted it in writing is so that Cosby could not take the 5th Amendment to avoid being deposed or testifying. A sound strategy to employ. That meant to all involved, including Cosby's lawyer at the time, Mr. Phillips, that what Cosby said in the civil litigation could not be used against him in a criminal prosecution for the event we had him under investigation for in early 2005. I signed the press release for precisely this reason, at the request of [Constand's] counsel, and with the acquiescence of Cosby's counsel, with full and

complete intent to bind the Commonwealth that anything Cosby said in the civil case could not be used against him, thereby forcing him to be deposed and perhaps testify in a civil trial without him having the ability to "take the 5th." I decided to create the best possible environment for [Constand] to prevail and be compensated. By signing my name as District Attorney and issuing the attached, I was "signing off" on the Commonwealth not being able to use anything Cosby said in the civil case against him in a criminal prosecution, because I was stating the Commonwealth will not bring a case against Cosby for this incident based upon then-available evidence in order to help [Constand] prevail in her civil action. Evidently, that strategy worked.

The attached, which was on letterhead and signed by me as District Attorney, the concept approved by [Constand's] lawyers was a "written declaration" from the Attorney for the Commonwealth there would be no prosecution based on anything Cosby *said* in the civil action. Naturally, if a prosecution could be made out without using what Cosby said, or anything derived from what Cosby said, I believed then and continue to believe that a prosecution is not precluded.

*Id.*, Exh. D-7.

Despite her predecessor's concerns, D.A. Ferman and the investigators pressed forward, reopening the criminal case against Cosby. Members of the prosecutorial team traveled to Canada and met with Constand, asking her to cooperate with their efforts to prosecute Cosby, even though she had specifically agreed not to do so as part of the civil settlement. Investigators also began to identify, locate, and interview other women that had claimed to have been assaulted by Cosby.

Nearly a decade after D.A. Castor's public decision not to prosecute Cosby, the Commonwealth charged Cosby with three counts of aggravated indecent assault[12] stemming from the January 2004 incident with Constand in Cosby's Cheltenham residence. On January 11, 2016, Cosby filed a petition for a writ of *habeas corpus*[13]

---

[12] By this time, Mr. Steele had replaced Judge Ferman as District Attorney. *See* 18 Pa.C.S. § 3125(a)(1), (a)(4), and (a)(5).

[13] Cosby styled the petition as a "Petition for Writ of *Habeas Corpus* and Motion to Disqualify the Montgomery County District Attorney's Office." The trial court treated the omnibus motion as three separate motions: (1) a motion to dismiss the charges based upon the alleged non-prosecution agreement; (2) a motion to dismiss the charges based

seeking, *inter alia*, dismissal of the charges based upon the former D.A. Castor's purported promise—made in his representative capacity on behalf of the Commonwealth—that Cosby would not be prosecuted. The Commonwealth filed a response to the motion, to which Cosby replied.

From February 2-3, 2016, the trial court conducted hearings on Cosby's *habeas* petition, which it ultimately denied. Later, in its Pa.R.A.P. 1925(a) opinion, the trial court explained that "the only conclusion that was apparent" from the record "was that no agreement or promise not to prosecute ever existed, only the exercise of prosecutorial discretion." Tr. Ct. Op. ("T.C.O."), 5/14/2019, at 62. In support of this conclusion, the trial court provided a lengthy summary of what it found to be the pertinent facts developed at the *habeas corpus* hearing. Because our analysis in this case focuses upon the trial court's interpretation of those testimonies, we reproduce that court's synopsis here:

> On January 24, 2005, then District Attorney Bruce L. Castor, Jr., issued a signed press release announcing an investigation into Ms. Constand's allegations. Mr. Castor testified that as the District Attorney in 2005, he oversaw the investigation into Ms. Constand's allegations. Ms. Ferman supervised the investigation along with County Detective Richard Peffall and Detective Richard Schaffer of Cheltenham. Mr. Castor testified that "I assigned who I thought were our best people to the case. And I took an active role as District Attorney because I thought I owed it to Canada to show that, in America, we will investigate allegations against celebrities."
>
> Mr. Castor testified that Ms. Constand went to the Canadian police almost exactly one year after the alleged assault and that the case was ultimately referred to Montgomery County. The lack of a prompt complaint was significant to Mr. Castor in terms of Ms. Constand's credibility and in terms of law enforcement's ability to collect physical evidence. He also placed significance on the fact that Ms. Constand told the Canadian authorities that she contacted a lawyer in Philadelphia prior to speaking with them. He also reviewed Ms. Constand's statements to police. Mr. Castor felt that there were inconsistences in her statements. Mr. Castor did not recall press quotes attributed to him calling the case "weak" at a 2005 press conference.

upon pre-arrest delay; and (3) a motion to disqualify the Montgomery County District Attorney's Office.

Likewise, he did not recall the specific statement, "[i]n Pennsylvania we charged people for criminal conduct. We don't charge people with making a mistake or doing something foolish;" however, he indicated that it is a true statement.

As part of the 2005 investigation, [Cosby] gave a full statement to law enforcement and his Pennsylvania and New York homes were searched. [Cosby] was accompanied by counsel and did not invoke the Fifth Amendment at any time during the statement. After [Cosby's] interview, Ms. Constand was interviewed a second time. Mr. Castor never personally met with Ms. Constand. Following that interview of Ms. Constand, Mr. Castor spoke to [Cosby's] attorney Walter M. Phillips, Jr. Mr. Phillips told Mr. Castor that during the year between the assault and the report, Ms. Constand had multiple phone contacts with [Cosby]. Mr. Phillips was also concerned that Ms. Constand had recorded phone calls with [Cosby]. Mr. Phillips told Mr. Castor that if he obtained the phone records and the recorded calls he would conclude that Ms. Constand and her mother were attempting was to get money from [Cosby] so they would not go to the police. While he did not necessarily agree with the conclusions Mr. Phillips thought would be drawn from the records, Mr. Castor directed the police to obtain the records. Mr. Castor's recollection was that there was an "inordinate number of [phone] contacts" between [Cosby] and Ms. Constand after the assault. He also confirmed the existence of at least two "wire interceptions," which he did not believe would be admissible.

As part of the 2005 investigation, allegations made by other women were also investigated. Mr. Castor delegated that investigation to Ms. Ferman. He testified that he determined that, in his opinion, these allegations were unreliable.

Following approximately one month of investigation, Mr. Castor concluded that "there was insufficient credible and admissible evidenced upon which any charge against Mr. Cosby related to the Constand incident could be proven beyond a reasonable doubt." He testified that he could either leave the case open at that point or definitively close the case to allow a civil case. He did not believe there was a chance that the criminal case could get any better. He believed Ms. Constand's actions created a credibility issue that could not be overcome.

\*     \*     \*

Mr. Castor further indicated, "Mr. Phillips never agreed to anything in exchange for Mr. Cosby not being prosecuted." Mr. Castor testified that he told Mr. Philips of his legal assessment and then told Ms. Ferman of the analysis and directed her to contact Constand's attorneys. He testified that she was to contact the attorneys to let them know that "Cosby was not going to be prosecuted and that the purpose for that was that I wanted to create

the atmosphere or the legal conditions such that Mr. Cosby would never be allowed to assert the Fifth Amendment in the civil case." He testified that she did not come back to him with any objection from Ms. Constand's attorneys and that any objection from Ms. Constand's attorneys would not have mattered anyway. He later testified that he did not have any specific recollection of discussing his legal analysis with Ms. Ferman, but would be surprised if he did not.

Mr. Castor testified that he could not recall any other case where he made this type of binding legal analysis in Montgomery County. He testified that in a half dozen cases during his tenure in the District Attorney's office, someone would attempt to assert the Fifth Amendment in a preexisting civil case. The judge in that case would then call Mr. Castor to determine if he intended to prosecute the person asserting the privilege. He could confirm that he did not and the claim of privilege would be denied. Mr. Castor was unable to name a case in which this happened.

After making his decision not to prosecute, Mr. Castor personally issued a second, signed press release on February 17, 2005. Mr. Castor testified that he signed the press release at the request of Ms. Constand's attorneys in order to bind the Commonwealth so it "would be evidence that they could show to a civil judge that Cosby is not getting prosecuted." The press release stated, "After reviewing the above and consulting with County and Cheltenham Detectives, the District Attorney finds insufficient, credible and admissible evidence exists upon which any charge against Mr. Cosby could be sustained beyond a reasonable doubt." Mr. Castor testified that this language made it absolute that [Cosby] would never be prosecuted, "[s]o I used the present tense, [exists], . . . So I'm making it absolute. I said I found that there was no evidence—there was insufficient credible and admissible evidence in existence upon which any charge against [Cosby] could be sustained. And the use of 'exists' and 'could' I meant to be absolute."

The press release specifically cautioned the parties that the decision could be revisited, "District Attorney Castor cautions all parties to this matter that he will reconsider this decision should the need arise." He testified that inclusion of this sentence, warning that the decision could be revisited, in the paragraph about a civil case and the use of the word "this," was intended to make clear that it applied to the civil case and not to the prosecution. Mr. Castor testified that this sentence was meant to advise the parties that if they criticized his decision, he would contact the media and explain that Ms. Constand's actions damaged her credibility, which would severely hamper her civil case. He testified that once he was certain a prosecution was not viable "I operated under the certainty that a civil suit was coming and set up the dominoes to fall in such a way that Mr. Cosby would be required to testify." He included the language "much exists in this investigation that could be used by others to portray persons on both sides of the issue in a

less than flattering light," as a threat to Ms. Constand and her attorneys should they attack his office. In a 2016 Philadelphia Inquirer article, in reference to this same sentence, Castor stated, "I put in there that if any evidence surfaced that was admissible I would revisit the issue. And evidently, that is what the D.A. is doing." He testified that he remembered making that statement but that it referred to the possibility of a prosecution based on other victims in Montgomery County or perjury.

He testified that the press release was intended for three audiences, the media, the greater legal community, and the litigants. He testified about what meaning he hoped that each audience would glean from the press release. He did not intend for any of the three groups to understand the entirety of what he meant. The media was to understand only that [Cosby] would not be arrested. Lawyers would parse every word and understand that he was saying there was enough evidence to arrest [Cosby] but that Mr. Castor thought the evidence was not credible or admissible. The third audience was the litigants, and they were to understand that they did not want to damage the civil case. He then stated that the litigants would understand the entirety of the press release, the legal community most of it and the press little of it.

Mr. Castor testified that in November of 2014 he was contacted by the media as a result of a joke a comedian made about [Cosby]. Again, in the summer of 2015 after the civil depositions were released, media approached Mr. Castor. He testified that he told every reporter that he spoke to in this time frame that the reason he had declined the charges was to strip Mr. Cosby of his Fifth Amendment privilege. He testified that he did not learn the investigation had been reopened until he read in the paper that [Cosby] was arrested in December 2015, but there was media speculation in September 2015 that an arrest might be imminent.

On September 23, 2015, apparently in response to this media speculation, unprompted and unsolicited, Mr. Castor sent an email to then District Attorney Risa Vetri Ferman. His email indicated, in pertinent part,

> I'm writing you just in case you might have forgotten what we did with Cosby back in 2005. . . Once we decided that the chances of prevailing in a criminal case were too remote to make an arrest, I concluded that the best way to achieve justice was to create an atmosphere where [Constand] would have the best chance of prevailing in a civil suit against Cosby. With the agreement of [Attorney Phillips] and [Constand's] lawyer, I wrote the attached [press release] as the ONLY comment I would make while the civil case was pending. Again, with the agreement of the defense lawyer and [Constand's] lawyers, I intentionally and specifically bound the Commonwealth that there would be no state prosecution of

Cosby in order to remove from him the ability to claim his Fifth Amendment protection against self-incrimination, thus forcing him to sit for a deposition under oath. . . . But those lawyers representing [Constand] civilly . . . were part of this agreement because they wanted to make Cosby testify. I believed at the time that they thought making him testify would solidify their civil case, but the only way to do that was for us (the Commonwealth) to promise not to prosecute him. So in effect, that is what I did. I never made an important decision without discussing it with you during your tenure as First Assistant.

\*　　　\*　　　\*

[B]ut one thing is fact. The Commonwealth, defense and civil plaintiff's lawyers were all in agreement that the attached decision from me stripped Cosby of his Fifth Amendment privilege against self-incrimination forcing him to be deposed.

He indicated in his email that he learned Mr. Phillips had died on the date of his email. The email also suggested that the deposition might be subject to suppression.

Ms. Ferman responded to Mr. Castor's email by letter of September 25, 2015, requesting a copy of the "written declaration" indicating that [Cosby] would not be prosecuted. In her letter, Ms. Ferman indicated that "[t]he first I heard of such a binding agreement was your email sent this past Wednesday. The first I heard of a written declaration documenting the agreement not to prosecute was authored on 9/24/15 and published today by Margaret Gibbons of the Intelligencer. . . . We have been in contact with counsel for both Mr. Cosby and Ms. Constand and neither has provided us with any information about such an agreement."

Mr. Castor responded by email. His email indicated,

The attached Press Release is the written determination that we would not prosecute Cosby. That was what the lawyers for the plaintiffs wanted and I agreed. The reason I agreed and the plaintiff's wanted it in writing was so Cosby could not take the 5th Amendment to avoid being deposed or testifying. . . . That meant to all involved, including Cosby's lawyer at the time, Mr. Phillips, that what Cosby said in the civil litigation could not be used against him in a criminal prosecution for the event we had him under investigation for in early 2005. I signed the press release for precisely this reason, at the request of Plaintiff's counsel, and with the acquiescence of Cosby's counsel, with full and complete intent to bind the Commonwealth that anything Cosby said in

the civil case could not be used against him, thereby forcing him to be deposed and perhaps testify in a civil trial without the ability to "take the 5th." I decided to create the best possible environment for the Plaintiff to prevail and be compensated. By signing my name as District Attorney and issuing the attached, I was "signing off" on the Commonwealth not being able to use anything Cosby said in the civil case against him in a criminal prosecution, because I was stating the Commonwealth will not bring a case against Cosby for the incident based on the then-available evidence in order to help the Plaintiff prevail in her civil action . . . [n]aturally, if a prosecution could be made out without using what Cosby said, or anything derived from what Cosby said, I believed then and continue to believe that a prosecution is not precluded.

Mr. Castor testified that he intended to confer transactional immunity upon [Cosby] and that his power to do so as the sovereign was derived from common law not from the statutes of Pennsylvania. In his final email to Ms. Ferman, Mr. Castor stated, "I never agreed we would not prosecute Cosby."

As noted, Ms. Constand's civil attorneys also testified at the hearing. Dolores Troiani, Esq. testified that during the 2005 investigation, she had no contact with the District Attorney's office and limited contact with the Cheltenham Police Department. Bebe Kivitz, Esq. testified that during the 2005 investigation she had limited contact with then-First Assistant District Attorney Ferman. The possibility of a civil suit was never discussed with anyone from the Commonwealth or anyone representing [Cosby] during the criminal investigation. At no time did anyone from Cheltenham Police, or the District Attorney's Office, convey to Ms. Troiani, or Ms. Kivitz, that [Cosby] would never be prosecuted. They learned that the criminal case was declined from a reporter who came to Ms. Troiani's office in the evening of February 17, 2005 seeking comment about what Bruce Castor had done. The reporter informed her that Mr. Castor had issued a press release in which he declined prosecution. Ms. Troiani had not receive any prior notification of the decision not to prosecute.

Ms. Constand and her attorneys did not request a declaration from Mr. Castor that [Cosby] would not be prosecuted. Ms. Troiani testified that if [Cosby] attempted to invoke the Fifth Amendment during his civil depositions they would have filed a motion and he would have likely been precluded since he had given a statement to police. If he was permitted to assert a Fifth Amendment privilege, they would have been entitled to an adverse inference jury instruction. Additionally, if [Cosby] asserted the Fifth Amendment, Ms. Constand's version of the story would have been the only version for the jury to consider. Ms. Constand and her counsel had no reason to request immunity. At no time during the civil suit did Ms. Troiani

receive any information in discovery or from [Cosby's] attorneys indicating that [Cosby] could never be prosecuted.

Ms. Troiani testified that she understood the press release to say that Mr. Castor was not prosecuting at that time but if additional information arose, he would change his mind. She did not take the language, "District Attorney Castor cautions all parties to this matter that he will reconsider this decision should the need arise," to be a threat not to speak publicly. She continued to speak to the press; Mr. Castor did not retaliate.

Ms. Troiani was present for [Cosby's] depositions. At no point during the depositions was there any mention of an agreement or promise not to prosecute. In her experience, such a promise would have been put on the record at the civil depositions. She testified that during the four days of depositions, [Cosby] was not cooperative and the depositions were extremely contentious. Ms. Troiani had to file motions to compel [Cosby's] answers. [Cosby's] refusal to answer questions related to Ms. Constand's allegations formed the basis of a motion to compel. When Ms. Troiani attempted to question [Cosby] about the allegations, [Cosby's] attorneys sought to have his statement to police read into the record in lieu of cross examination.

Ms. Troiani testified that one of the initial provisions [Cosby] wanted in the civil settlement was a release from criminal liability. [Cosby's civil attorney Patrick] O'Conner's letter to Ms. Ferman does not dispute this fact. [Cosby] and his attorneys also requested that Ms. Troiani agree to destroy her file, she refused. Eventually, the parties agreed on the language that Ms. Constand would not initiate any criminal complaint. The first Ms. Troiani heard of a promise not to prosecute was in 2015. The first Ms. Kivitz learned of the purported promise was in a 2014 newspaper article.

John P. Schmitt, Esq., testified that he has represented [Cosby] since 1983. In the early 1990s, he became [Cosby's] general counsel. In 2005, when he became aware of the instant allegations, he retained criminal counsel, William Phillips, Esq., on [Cosby's] behalf. Mr. Phillips dealt directly with the prosecutor's office and would then discuss all matters with Mr. Schmitt. [Cosby's] January 2005 interview took place at Mr. Schmitt's office. Both Mr. Schmitt and Mr. Phillips were present for the interview. Numerous questions were asked the answers to which could lead to criminal charges. At no time during his statement to police did [Cosby] invoke the Fifth Amendment or refuse to answer questions. Mr. Schmitt testified that he had interviewed [Cosby] prior to his statement and was not concerned about his answers. Within weeks of the interview, the District Attorney declined to bring a prosecution. Mr. Schmitt testified that Mr. Phillips told him that the decision was an irrevocable commitment that District Attorney Castor was not going to prosecute [Cosby]. He received a copy of the press release.

On March 8, 2005, Ms. Constand filed her civil suit and Mr. Schmitt retained Patrick O'Conner, Esq., as civil counsel. Mr. Schmitt participated in the civil case. [Cosby] sat for four days of depositions. Mr. Schmitt testified that [Cosby] did not invoke the Fifth Amendment in those depositions and that he would not have let him sit for the depositions if he knew the criminal case could be reopened.

He testified that generally he does try to get agreements on [Cosby's] behalf in writing. During this time period, Mr. Schmitt was involved in written negotiations with the National Enquirer. He testified that he relied on the press release, Mr. Castor's word and Mr. Phillips' assurances that what Mr. Castor did was sufficient. Mr. Schmitt did not personally speak to Mr. Castor or get the assurance in writing. During the depositions, Mr. O'Conner objected to numerous questions. At the time of the depositions, Mr. Schmitt, through his negotiations with the National Enquirer, learned that there were Jane Doe witnesses making allegations against [Cosby]. [Cosby] did not assert a Fifth Amendment privilege when asked about these other women. Mr. Schmitt testified that he had not formed an opinion as to whether Mr. Castor's press release would cover that testimony.

Mr. Schmitt testified that during negotiations of the settlement agreement there were references to a criminal case. The settlement agreement indicated that Ms. Constand would not initiate a criminal case against Mr. Cosby. Mr. Schmitt did not come forward when he learned the District Attorney's office re-opened the case in 2015.

T.C.O. at 47-61 (cleaned up).

Notably, when District Attorney Castor decided not to prosecute Cosby, he "absolutely" intended to remove "for all time" the possibility of prosecution, because "the ability to take the Fifth Amendment is also for all time removed." N.T., 2/2/2016, at 67. The trial court sought clarification from Mr. Castor about his statement in his second email to D.A. Ferman that he still believed that a prosecution was permissible as long as Cosby's depositions were not used in such proceedings. Former D.A. Castor explained to the court that he meant that a prosecution may be available only if other victims were discovered, with charges related only to those victims, and without the use of Cosby's depositions in the Constand matter. Specifically, former D.A. Castor stated that what he was "trying to convey to Mrs. Ferman [was that his] binding of the Commonwealth not to prosecute Cosby was not for any crime in Montgomery County for all time. It was only

for the sexual assault crime in the Constand case." N.T., 2/2/2016, at 224-25. He continued, "[s]o if they had evidence that some of these other women had been sexually assaulted at Cosby's home in Cheltenham, then I thought they could go ahead with the prosecution of that other case with some other victim, so long as they realized they could not use the Constand deposition and anything derived therefrom." *Id.*

As noted, the trial court denied the motion, finding that then-D.A. Castor never, in fact, reached an agreement with Cosby, or even promised Cosby that the Commonwealth would not prosecute him for assaulting Constand. T.C.O. at 62. Instead, the trial court considered the interaction between the former district attorney and Cosby to be an incomplete and unauthorized contemplation of transactional immunity. The trial court found no authority for the "proposition that a prosecutor may unilaterally confer transactional immunity through a declaration as the sovereign." *Id.* Rather, the court noted, such immunity can be conferred only upon strict compliance with Pennsylvania's immunity statute, which is codified at 42 Pa.C.S. § 5947.[14] Per the terms of the statute,

---

[14] The immunity statute provides, in relevant part:

**(a) General rule.**--Immunity orders shall be available under this section in all proceedings before:

(1) Courts.

*     *     *

**(b) Request and issuance.**--The Attorney General or a district attorney may request an immunity order from any judge of a designated court, and that judge shall issue such an order, when in the judgment of the Attorney General or district attorney:

(1) the testimony or other information from a witness may be necessary to the public interest; and

(2) a witness has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

permission from a court is a prerequisite to any offer of transactional immunity. *See id.* § 5947(b) ("The Attorney General or a district attorney may request an immunity order from any judge of a designated court."). Because D.A. Castor did not seek such permission, and instead acted of his own volition, the trial court concluded that any purported immunity offer was defective, and thus invalid. Consequently, according to the trial court, the "press release, signed or not, was legally insufficient to form the basis of an enforceable promise not to prosecute." T.C.O. at 62.

The trial court also found that "Mr. Castor's testimony about what he did and how he did it was equivocal at best." *Id.* at 63. The court deemed the former district attorney's characterization of his decision-making and intent to be inconsistent, inasmuch as he testified at times that he intended transactional immunity, while asserting at other times that he intended use and derivative-use immunity. The trial court specifically credited Attorney Troiani's statements that she never requested that Cosby be provided with immunity and that she did not specifically agree to any such offer.

**(c) Order to testify.**--Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding specified in subsection (a), and the person presiding at such proceeding communicates to the witness an immunity order, that witness may not refuse to testify based on his privilege against self-incrimination.

**(d) Limitation on use.**--No testimony or other information compelled under an immunity order, or any information directly or indirectly derived from such testimony or other information, may be used against a witness in any criminal case, except that such information may be used:

> (1) in a prosecution under 18 Pa.C.S. § 4902 (relating to perjury) or under 18 Pa.C.S. § 4903 (relating to false swearing);

> (2) in a contempt proceeding for failure to comply with an immunity order; or

> (3) as evidence, where otherwise admissible, in any proceeding where the witness is not a criminal defendant.

42 Pa.C.S. § 5947(a)-(d).

As further support for the view that no agreement was reached, nor any promise extended, the trial court noted that, in his initial statement to police, which was voluntarily provided and not under oath, Cosby did not invoke his Fifth Amendment rights. Instead, Cosby presented a narrative of a consensual sexual encounter with Constand, which he asserted again later in his depositions. "Thus," the trial court explained, "there was nothing to indicate that [Cosby's] cooperation would cease if a civil case were filed." *Id.* at 65. Since Cosby previously had discussed the incident without invoking his right to remain silent, the court found no reason to believe that Cosby subsequently would do so in a civil case so as to necessitate the remedy that the former district attorney purported to provide in anticipation of that litigation.

The trial court further held that, even if there was a purported grant of immunity, Cosby could not insist upon its enforcement based upon the contractual theory of promissory estoppel, because "any reliance on a press release as a grant of immunity was unreasonable." *Id.* Specifically, the court noted that Cosby was represented at all times by a competent team of attorneys, but none of them "obtained [D.A.] Castor's promise in writing or memorialized it in any way." *Id.* at 65-66. The failure to demand written documentation was evidence that no promise not to prosecute was ever extended. For these reasons, the trial court found no legal basis to estop the Commonwealth from prosecuting Cosby.

Cosby filed a notice of appeal and a petition for review with the Superior Court. In response to the filings, the Superior Court temporarily stayed the proceedings below. However, upon a motion by the Commonwealth, the Superior Court quashed the appeal and lifted the stay. This Court likewise rejected Cosby's pre-trial efforts to appeal the adverse rulings, denying his petition for allowance of appeal, his petition for review, and his emergency petition for a stay of the proceedings.

On May 24, 2016, following a preliminary hearing, all of Cosby's charges were held for trial. Thereafter, Cosby filed a number of pretrial motions, including a petition for a writ of *habeas corpus*, a motion to dismiss the charges on due process grounds, and, most pertinent here, a "Motion to Suppress the Contents of his Deposition Testimony and Any Evidence Derived therefrom on the Basis that the District Attorney's Promise not to Prosecute Him Induced Him to Waive his Fifth Amendment Right Against Self-Incrimination." After holding a hearing on the suppression motion, at which no new testimony was taken, the trial court again concluded that former District Attorney Castor's testimony was equivocal, credited the testimony of Constand's attorneys, and found that no promise or agreement not to prosecute existed. Having so determined, the court discerned "no [c]onstitutional barrier to the use of [Cosby's] civil deposition testimony" against him at trial, and it denied the suppression motion.[15] Later, the Commonwealth would introduce portions of Cosby's deposition testimony against Cosby, including his admissions to using Quaaludes during sexual encounters with women in the past.

On September 6, 2016, the Commonwealth filed a "Motion to Introduce Evidence of Other Bad Acts of the Defendant," which Cosby opposed by written response. The Commonwealth sought to introduce evidence and testimony from other women who alleged that Cosby had sexually assaulted them, instances that could not be prosecuted due to the lapse of applicable statutes of limitations. On February 24, 2017, the trial court granted the Commonwealth's motion, but permitted only one of these alleged past victims to testify at Cosby's trial.

On December 30, 2016, Cosby filed a motion seeking a change in venue or venire. The trial court kept the case in Montgomery County, but agreed that the jury should be

---

[15] T.C.O. at 72 (quoting Findings of Fact, Conclusions of Law and Order Sur Defendant's Motion to Suppress Evidence Pursuant to Pa.R.Crim.P. 581(I), 12/5/2016, at 5).

selected from a different county. Thus, Cosby's jury was selected from residents of Allegheny County, and trial commenced. On June 17, 2017, after seven days of deliberation, the jury announced that it could not reach a unanimous verdict. The trial court dismissed the jury and declared a mistrial.

Ahead of the second trial, the Commonwealth filed a motion seeking to introduce the testimony of a number of additional women who offered to testify about Cosby's prior acts of sexual abuse. Generally, the women averred that, in the 1980s, each had an encounter with Cosby that involved either alcohol, drugs, or both, that each became intoxicated or incapacitated after consuming those substances, and that Cosby engaged in some type of unwanted sexual contact with each of them while they were unable to resist. The dates of the conduct that formed the basis of these allegations ranged from 1982 to 1989, approximately fifteen to twenty-two years before the incident involving Constand. Again, Cosby opposed the motion. Following oral argument, and despite there being no change in circumstances other than the first jury's inability to reach a unanimous verdict, the trial court granted the Commonwealth's motion in part, increasing the number of prior bad acts witnesses allowed at trial from one to five. The selection of the five witnesses from a pool of at least nineteen women was left entirely to the Commonwealth.

The Commonwealth selected, and introduced testimony at Cosby's second trial from, the following women:

*Janice Baker-Kinney*. In 1982, Baker-Kinney worked at a Harrah's Casino in Reno, Nevada. During that year, a friend invited her to a party that, unbeknownst to her, was being held at a temporary residence used by Cosby in Reno. At the time, Baker-Kinney was twenty-four years old; Cosby was forty-five. When Baker-Kinney arrived at the residence, she realized that there actually was no party, at least as she understood

the term. Besides Cosby, Baker-Kinney and her friend were the only people there. Cosby gave Baker-Kinney a beer and a pill, which she believed may have been a Quaalude. A short time later, Cosby gave her a second pill. She took both voluntarily, after which she became dizzy and passed out. When she awakened, she was on a couch in another room. Her shirt was unbuttoned and her pants were unzipped. Cosby approached and sat next to her. Cosby then leaned her against his chest. He fondled her breasts and her vagina. Still intoxicated, Baker-Kinney followed Cosby to an upstairs bedroom. She had no memory of what happened after entering the bedroom until the following morning, when she woke up naked next to Cosby, who also was naked. Although she could not remember for sure, Baker-Kinney believed that they had had sex. She dressed and left.

*Janice Dickinson*. Also in 1982, Janice Dickinson met Cosby. She was twenty-seven years old. Dickinson was an aspiring model, and Cosby contacted her modeling agency to arrange a meeting. Supposedly, Cosby wanted to mentor Dickinson. Along with her agent, Dickinson met with Cosby. Sometime later, while she was on a modeling job, Cosby called her and offered to fly her to Lake Tahoe. There, Dickinson met with Cosby's musical director and practiced her vocal skills. At dinner that night, Cosby arrived and met with Dickinson, who was drinking wine. Dickinson mentioned that she was suffering from menstrual cramps. Cosby provided her with a pill to help relieve the discomfort. The musical director eventually left, and Cosby offered to discuss Dickinson's career in his hotel room. She agreed and accompanied him there. When they got to the room, Cosby put on a robe and made a phone call. Dickinson felt lightheaded and had trouble speaking. Cosby got off the phone, climbed on top of Dickinson, and had sexual intercourse with her. Dickinson stated that she was unable to move and that she passed out soon after Cosby had finished. When she woke up the next morning, she did not

recall how she had arrived at Cosby's room. She was naked from the waist down, had semen on her legs, and felt pain in her anus.

*Heidi Thomas*: In 1984, Heidi Thomas was twenty-seven years old, and Cosby was forty-six. Thomas wanted to be an actress and a model. Her agent told her that Cosby was looking to mentor a promising young talent. Eventually, Cosby invited Thomas to Reno for some personal acting lessons. Thomas believed that she would be staying at a hotel, but, when she got to Reno, a car took her to a ranch house where Cosby was staying. Cosby arranged a room in the house for her. When they were the only two people left in the house, Cosby asked Thomas to audition for him by pretending to be an intoxicated person, which she explained to Cosby would be a challenge for her because she had never been intoxicated. Cosby asked how she could play such a role without ever having had that experience. So, he gave her some wine. Thomas drank only a little of the wine before becoming extremely intoxicated. She faded in and out of consciousness. At one point she came to on a bed only to find Cosby forcing his penis into her mouth. She passed out and awoke later feeling sick.

*Chelan Lasha*. Lasha met Cosby in 1986, while she was working as an actress and model. She was only seventeen years old. Cosby was forty-eight. Cosby called her at her home, and later visited her there. Lasha then sent him modeling shots and spoke with him a number of times on the phone about her career. Cosby invited her to meet him in Las Vegas, where, he told her, someone would take better pictures of her. He implied that she could get a role on "The Cosby Show." Enticed by the prospect, Lasha went to Las Vegas. As promised, once there, someone took pictures of her. Someone else gave her a massage. Eventually, Lasha was alone with Cosby. He gave her a blue pill, which he said was an antihistamine that would help with a cold from which she was suffering. Cosby also provided her with a shot of liquor. Because Lasha trusted Cosby,

she voluntarily consumed both the alcohol and the pill. Cosby then gave her a second shot and led her to a couch. Lasha began to feel intoxicated. Lasha was unable to move on her own, and Cosby helped her to the bed. Cosby laid next to her, pinched her breasts, and rubbed his genitals against her leg until she felt something warm on her leg. Lasha woke up the next day wearing only a robe.

*Maud Lise-Lotte Lublin*. When Cosby met Lublin in 1989, he was fifty-two years old, and she was twenty-three. Lublin also was an aspiring model and actress. Lublin's agent informed her that Cosby wanted to meet her. Soon after, Lublin met with Cosby, who told her that he would refer her to a modeling agency in New York City. Cosby then started to call her regularly. Lublin considered Cosby to be a mentor and a father figure. Once, Cosby invited her to his hotel, where they talked about improvisation. Cosby poured her a shot of liquor and told her to drink it. Not normally a drinker, Lublin initially declined the shot. When Cosby insisted, she drank it. He poured her another shot, and again strongly encouraged her to drink it. Because she trusted him, Lublin drank the second shot as well. She quickly felt dizzy and unstable, and was unable to stand on her own. Cosby asked her to sit between his legs and lean against his chest. He stroked her hair and talked, but she could not hear his words. She could not move or get up. She awoke two days later at her home, with no idea how she got there.

The trial court rejected Cosby's arguments that the introduction of testimonies from the five prior bad acts witnesses violated his due process rights, and that the incidents were too remote in time and too dissimilar to have probative value, let alone probative value sufficient to overcome the unduly prejudicial impact of such evidence. The court noted that prior bad acts evidence generally cannot be used to establish a criminal propensity or to prove that the defendant acted in conformity with the past acts, but that such evidence can be used to show motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident, so long as the probative value of the evidence outweighs its prejudicial effect.[16] The court then determined that the testimony of the five prior bad act witnesses—and the deposition testimony pertaining to the prior use of Quaaludes—was admissible to demonstrate Cosby's common plan, scheme, or design. The trial court reasoned that the similarity and distinctiveness of the crimes bore a logical connection to Constand's allegations, and amounted to a "signature of the same perpetrator."[17] Comparing the past and present allegations, the court noted that each woman was substantially younger than Cosby and physically fit; that Cosby initiated the contact with each woman, primarily though her employment; that each woman came to trust Cosby and view him as a friend or mentor; that each woman accepted an invitation to a place that Cosby controlled; that each woman consumed a

---

[16] T.C.O. 96-97 (citing Pa.R.E. 404(b)). Rule 404 provides, in relevant part:

(a) Character Evidence.

(1) *Prohibited Uses.* Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

\* \* \*

(b) Crimes, Wrongs or Other Acts.

(1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

[17] *Id.* at 97 (quoting *Commonwealth v. Tyson*, 119 A.3d 353, 358-59 (Pa. Super. 2015) (*en banc*)).

drink or a pill, often at Cosby's insistence; that each woman became incapacitated and unable to consent to sexual contact; and that Cosby sexually assaulted each woman while each was under the influence of the intoxicant. *Id.* at 103-04. These "chilling similarities," the court explained, rendered Cosby's actions "so distinctive as to become a signature," and therefore the evidence was admissible to demonstrate a common plan, scheme, or design. *Id.* at 104.

The court further determined that the prior bad acts evidence was admissible to demonstrate that Cosby's actions were not the result of mistake or accident. The court relied in large part upon then-Chief Justice Saylor's concurrence in *Commonwealth v. Hicks*, 156 A.3d 1114 (Pa. 2017), which suggested the "doctrine of chances" as another "theory of logical relevance that does not depend on an impermissible inference of bad character, and which is most greatly suited to disproof of accident or mistake." *Id.* at 1131 (Saylor, C.J., concurring). The trial court reasoned that the purpose of the evidence was not to demonstrate that Cosby behaved in conformity with a criminal propensity, but rather to "establish the objective improbability of so many accidents befalling the defendant *or the defendant becoming innocently enmeshed in suspicious circumstances so frequently.*" *Id.* at 1133 (Saylor, C.J., concurring). The court noted that there was no dispute that a sexual encounter between Cosby and Constand had occurred; the contested issue was Constand's consent. The prior bad acts evidence, therefore, was "relevant to show a lack of mistake, namely, that [Cosby] could not have possibly believed that [] Constand consented to the digital penetration as well as his intent in administering an intoxicant." T.C.O at 108. Similarly, with regard to the "doctrine of chances," the court opined that the fact that nineteen women were proffered as Rule 404(b) witnesses "lends [*sic*] to the conclusion that [Cosby] found himself in this situation more frequently than the general population." *Id.* Accordingly, "the fact that numerous other women recounted the

same or similar story, further supports the admissibility of this evidence under the doctrine of chances." *Id.*

The trial court recognized that the alleged assaults upon the prior bad acts witnesses were remote in time, but it explained that remoteness "is but one factor that the court should consider." *Id.* at 97. The court reasoned that the distance in time between the prior acts and the incident involving Constand was "inversely proportional to the similarity of the other crimes or acts." *Id.* (citing *Tyson*, 119 A.3d at 359). Stated more simply, the "more similar the crimes, the less significant the length of time that has passed." *Id.* at 98 (citing *Commonwealth v. Luktisch*, 680 A.2d 877 (Pa. Super. 1996)). The court noted that, while there was a significant temporal gap between the prior incidents and Constand's case, the alleged assaults involving the prior bad acts witnesses occurred relatively close in time to each other. Thus, "[w]hen taken together," the court explained, "the sequential nature of the acts coupled with their nearly identical similarities renders the lapse of time unimportant." *Id.* at 109.

To be unfairly prejudicial, the trial court emphasized, the proffered evidence must be "unfair," and must have a "tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Id.* at 100 (quoting Pa.R.E. 403 cmt). Evidence "will not be prohibited merely because it is harmful to the defendant," and a court "is not required to sanitize the trial to eliminate all unpleasant facts." *Id.* at 100-01 (quoting *Commonwealth v. Conte*, 198 A.3d 1169, 1180-81 (Pa. Super. 2018)). For the trial court, the aforementioned similarities between Constand's claim and that of the other alleged victims weighed in favor of admissibility, particularly because the court believed that the Commonwealth had a "substantial need" for the evidence. *Id.* at 109. "Where the parties agreed that the digital penetration occurred, the evidence of other acts was necessary to rebut [Cosby's] characterization of

the assault as a consensual encounter." *Id.* "Furthermore," the court opined, "Ms. Constand did not report the assault until approximately one year later, further supporting the Commonwealth's need for the evidence." *Id.* at 110. With regard to the prejudicial impact of the evidence, the court suggested that it had sufficiently mitigated any potential prejudice when it limited the number of witnesses who could testify (at the second trial) to just five of the nineteen witnesses that the Commonwealth requested. *Id.* The court noted that it found all nineteen witness' testimony to be relevant and admissible, but limited the number to five so as to mitigate the prejudice to Cosby. The court added that it gave cautionary instructions on the permissible use of this evidence, designed so as to limit its prejudicial impact. *Id.* at 110-11.

Finally, the trial court rejected Cosby's challenge to the admissibility of the contents of his deposition testimony to the extent that it concerned his use of Quaaludes in decades past. The court opined that Cosby's "own words about his use and knowledge of drugs with a depressant effect was relevant to show his intent and motive in giving a depressant to [] Constand." *Id.* at 115. Because the evidence demonstrated Cosby's knowledge of the effects of drugs such as Quaaludes, the court reasoned, Cosby "either knew [Constand] was unconscious, or recklessly disregarded the risk that she could be." *Id.* As with the Rule 404(b) witnesses, the court found that any prejudicial effect of this evidence was mitigated by the court's cautionary instructions. *Id.* Accordingly, the court trial opined that all of the Rule 404(b) evidence was admissible.

At the conclusion of a second jury trial, Cosby was convicted on all three counts of aggravated indecent assault. Following the denial of a number of post-trial motions, the trial court deemed Cosby to be a "sexually violent predator" pursuant to the then-applicable version of the Sex Offender Registration and Notification Act ("SORNA"), 42 Pa.C.S. §§ 9799.10-9799.41. The trial court then sentenced Cosby to three to ten years

in prison. Cosby was denied bail pending an appeal. He filed post-sentence motions seeking a new trial and a modification of his sentence, which were denied.

Cosby timely filed a notice of appeal, prompting the trial court to order him to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Cosby complied. On May 14, 2019, the trial court responded to Cosby's concise statement with its opinion, issued pursuant to Pa.R.A.P. 1925(a).

A unanimous panel of the Superior Court affirmed the judgment of sentence in all respects. *Commonwealth v. Cosby*, 224 A.3d 372 (Pa. Super. 2019). The Superior Court began by assessing Cosby's challenge to the admissibility of the prior bad acts evidence under Rule 404(b). The panel observed that a reviewing court must evaluate the admission of evidence pursuant to the abuse-of-discretion standard. *Id.* at 397. Addressing the trial court's rationale regarding the admissibility of prior bad acts evidence demonstrating a common plan, scheme, or design, the panel noted that the exception aims to establish a perpetrator's identity based upon "his or her commission of extraordinarily similar criminal acts on other occasions. The exception is demanding in it[s] constraints, requiring nearly unique factual circumstances in the commission of a crime, so as to effectively eliminate the possibility that it could have been committed by anyone other than the accused." *Id.* at 398 (citing *Commonwealth v. Miller*, 664 A.2d 1310, 1318 (Pa. 1995)). Although the common plan, scheme, or design rationale typically is used to establish the identity of a perpetrator of a particular crime, the Superior Court pointed out that courts previously have also used the exception "to counter [an] anticipated defense of consent." *Id.* (quoting *Tyson*, 119 A.3d at 361).

In *Tyson*, Jermeel Omar Tyson brought food to his victim, who was feeling ill. *Tyson*, 119 A.3d at 356. While Tyson remained in the residence, the victim fell asleep. When she awoke some time later, Tyson was having vaginal intercourse with her. She

told Tyson to stop, and he complied. But, when she fell asleep a second time, he resumed the uninvited sexual contact. Tyson was arrested and charged with sex-related offenses. *Id.*

Before trial, the Commonwealth sought to introduce evidence of a rape for which Tyson had been convicted in Delaware twelve years earlier. *Id.* The Delaware offense involved a victim of the same race and of a similar age as the victim in *Tyson*. *Id.* The Delaware victim similarly was casually acquainted with Tyson, invited Tyson into her home, was in a compromised state, and awoke to find Tyson engaged in vaginal intercourse with her. *Id.* at 357. The trial court declined to admit the Rule 404(b) evidence against Tyson. *Id.* at 356. On interlocutory appeal, the Superior Court reversed the trial court's decision, finding that the proffered evidence was admissible. *Id.* at 363. The court reasoned that the "relevant details and surrounding circumstances of each incident further reveal criminal conduct that is sufficiently distinctive to establish [that Tyson] engaged in a common plan or scheme." *Id.* at 360.[18] Notably, the *Tyson Court* found the twelve-year gap between Tyson's Delaware conviction and the offense at issue to be "less important" when compared to the strength of the similarities between the crimes. *Id.* at 361.

With *Tyson* in mind, the Superior Court turned its attention to the case *sub judice*. Based upon the similarities between Constand's allegations and those of Cosby's other accusers identified by the trial court, the Superior Court agreed that the accounts of the

---

[18] The *en banc* majority opinion in *Tyson* was authored by then-President Judge Gantman and joined by then-Judge Mundy, President Judge Emeritus Ford Elliott, and Judges Panella, Shogan, and Olson. Then-Judge Donohue dissented, joined by President Judge Emeritus Bender and Judge Ott, opining that the majority "overemphasize[d] the few similarities that exist between Tyson's prior rape conviction and the present matter while completely dismissing the several important differences between the two incidents." *Tyson*, 119 A.3d at 363 (Donohue, J., dissenting). The dissent further disputed the *en banc* majority's reliance upon the need for the prior bad acts evidence "to bolster the credibility of the Commonwealth's only witness where there is no indication that the witness is otherwise impeachable." *Id.* at 364.

five prior bad acts witnesses established a "predictable pattern" that reflected Cosby's "unique sexual assault playbook." *Cosby*, 224 A.3d at 402. Accordingly, the panel concluded that the witnesses' testimony was admissible to show Cosby's common plan, scheme, or design.

The Superior Court further agreed with the trial court that the prior bad acts evidence was admissible to demonstrate the absence of mistake on Cosby's part as to Constand's consent. The court concluded that *Tyson*'s rationale was applicable to the instant case. The court rejected Cosby's efforts to distinguish Constand's allegations from those dating to the 1980s. Cosby emphasized the fact that the relationship between Cosby and Constand lasted longer than his relationship with any of the prior bad acts witnesses, that Constand was a guest at Cosby's home on multiple occasions, that Cosby and Constand had exchanged gifts, that Cosby had made prior sexual advances toward Constand, that the nature of the sexual contact differed among the alleged victims, and that the alleged prior assaults occurred in hotel rooms or at the home of a third party, while the incident with Constand occurred in Cosby's home. *Id.* at 401-02. The Superior Court dismissed these apparent dissimilarities as unimportant, opining that "[i]t is impossible for two incidents of sexual assault involving different victims to be identical in all respects." *Id.* at 402. The court added that it would be "simply unreasonable" to require two incidents to be absolutely identical in order to be admissible under Rule 404(b), and concluded that "[i]t is the pattern itself, and not the mere presence of some inconsistencies between the various assaults, that determines admissibility under these exceptions." *Id.*

As to the temporal gap between the prior bad acts and the incident involving Constand, the Superior Court acknowledged that, even if the evidence were otherwise admissible under Rule 404(b), it "will be rendered inadmissible if it is too remote." *Id.* at 405 (quoting *Commonwealth v. Shively*, 424 A.2d 1257, 1259 (Pa. 1981)). The panel

agreed with the trial court's statement that the significance of the age of a prior bad act is "inversely proportional" to the similarity between the prior bad act and the facts underlying the charged offense. *Id.* (quoting *Commonwealth v. Aikens*, 990 A.2d 1181, 1185 (Pa. Super. 2010)). Although the panel recognized the significant lag in time between the events in question, it relied upon the similarities as found by the trial court to conclude that "the at-issue time gap is relatively inconsequential." *Id.* "Moreover," the panel opined, "because [Cosby's] identity in this case was not in dispute (as he claimed he only engaged in consensual sexual contact with [Constand]), there was no risk of misidentification" through the admission of the prior bad acts evidence, "despite the gap in time." *Id.*

Additionally, the Superior Court rejected Cosby's contention that the trial court had failed to weigh adequately the prejudicial impact of the prior bad acts evidence. The panel highlighted the fact that the trial court provided the jury with cautionary instructions on the use of the evidence, as well as that court's decision to limit the number of prior bad acts witnesses to five. These steps, in the Superior Court's view, were sufficient to mitigate the prejudicial impact of the evidence. *Id.*

The Superior Court dealt separately with Cosby's Rule 404(b) challenge to the use of his deposition testimony regarding his provision of Quaaludes to women in the past. The court rejected Cosby's "attempts to draw a hard distinction between Quaaludes and Benadryl," and noted that "the jury was free to disbelieve [Cosby's] assertion that he only provided [Constand] with Benadryl." *Id.* at 420. The court credited the Commonwealth's argument that Cosby's familiarity with Quaaludes was suggestive of his *mens rea*, inasmuch as it was "highly probative of 'the circumstances known to him for purposes of determining whether he acted with the requisite *mens rea* for the offense of aggravated indecent assault—recklessness." *Id.* (quoting Pa.R.E. 404(b)(2)). Moreover, Cosby's "knowledge of the use of central nervous system depressants, coupled with his likely past

use of the same with the [prior bad acts] witnesses, were essential to resolving the otherwise he-said-she-said nature of [Constand's] allegations." *Id.* The Superior Court added that the trial court did not err in determining that the probative value of this evidence outweighed its potential for unfair prejudice, inasmuch as, "in a vacuum, Cosby's use and distribution of a then-legal 'party drug' nearly half a century ago did not appear highly prejudicial," and "only becomes significantly prejudicial, *and fairly so*, when, in the context of other evidence, it establishes Cosby's knowledge of and familiarity with central nervous system depressants for purposes of demonstrating that he was at least reckless" in giving Constand such a drug before having sexual contact with her. *Id.* at 420-21 (emphasis in original) (cleaned up). The court added that any potential for unfair prejudice was mitigated substantially by the court's cautionary instructions, and that, accordingly, there was no error in the admission of this evidence. *Id.* at 421.

Turning to Cosby's claims relating to the enforceability of the non-prosecution or immunity decision rendered by then-District Attorney Castor, the Superior Court viewed this as a challenge to the denial of a motion to quash a criminal complaint, which would be evaluated under an abuse-of-discretion standard. *Id.* at 410. Like the trial court, the panel found no "authority suggesting that a district attorney 'may unilaterally confer transactional immunity through a declaration as the sovereign.'" *Id.* at 411 (quoting T.C.O. at 62). Therefore, the court opined, "it is clear on the face of the record that the trial court did not abuse its discretion in determining that there was no enforceable non-prosecution agreement in this case." *Id.* The court added: "Even assuming Mr. Castor promised not to prosecute [Cosby], only a court order can convey such immunity. Such promises exist only as exercises of prosecutorial discretion, and may be revoked at any time." *Id.* The court discussed the immunity statute and observed that it provides that "a district attorney may request an immunity order from any judge of a designated

court . . . ." *Id.* (quoting 42 Pa.C.S. § 5947(b)). Because no such order existed here, the Superior Court concluded that it could "ascertain no abuse of discretion in the trial court's determination that [Cosby] was not immune from prosecution, because Mr. Castor failed to seek or obtain an immunity order pursuant to Section 5947." *Id.* at 412. "Only a court order conveying such immunity is legally binding in this Commonwealth." *Id.*

The Superior Court further rejected Cosby's invocation of promissory estoppel asserting reliance upon D.A. Castor's assurances, as demonstrated by Cosby's cooperation with Constand's civil suit and his decision not to invoke the Fifth Amendment during his deposition testimony. The panel opined that Cosby failed to cite sufficient authority to establish that a prosecution may be barred under a promissory estoppel theory. The panel further agreed with the trial court that, in any event, "it was not reasonable for [Cosby] to rely on Mr. Castor's promise, even if the trial court had found credible the testimony provided by Mr. Castor and [Cosby's] civil attorney," Attorney Schmitt. *Id.* The panel stated: "We cannot deem reasonable [Cosby's] reliance on such a promise when he was represented by counsel, especially when immunity can only be granted by a court order, and where no court order granting him immunity existed." *Id.* at 413.

The Superior Court further opined that there was "virtually no evidence in the record that [Cosby] actually declined to assert his Fifth Amendment rights at the civil deposition based on Mr. Castor's purported promise not to prosecute." *Id.* Although the court noted that Attorney Schmitt was the only witness who could testify that Cosby indeed relied upon Castor's purported promise during his deposition (Attorney Schmitt did so testify), it emphasized the Commonwealth's argument that Attorney Schmitt allowed Cosby to give a statement to the police during the initial investigation, that Cosby did not incriminate himself at that point, that Attorney Schmitt further negotiated with the

National Enquirer on the details of its published interview with Cosby, and that Attorney Schmitt negotiated a term of the settlement agreement with Constand that required her assurance that she would not cooperate with any future criminal investigation. Thus, the Commonwealth argued, and the Superior Court agreed, that "[i]t was not necessary for the trial court to specifically state that it rejected . . . Schmitt's testimony, as it is patently obvious that his testimony belies his claim that there was some 'promise' from [Mr.] Castor not to prosecute." *Id.* (quoting Commonwealth's Superior Court Brief at 136-37). The Superior Court agreed that "the evidence was entirely inconsistent with [Cosby's] alleged reliance on Mr. Castor's promise in choosing not to assert his Fifth Amendment privilege in the civil suit." *Id.* at 413-14.

For the same reasons, the Superior Court rejected Cosby's claim that the trial court erred in failing to suppress his deposition testimony due to the immunity that he purportedly should have enjoyed. The court opined that Cosby's suppression argument was "contingent upon his claim that Mr. Castor unilaterally immunized [Cosby] from criminal prosecution, which we have already rejected." *Id.* at 414. The panel distinguished all of the precedents upon which Cosby relied, including this Court's decision in *Commonwealth v. Stipetich*, 652 A.2d 1294 (Pa. 1995).

In *Stipetich*, Pittsburgh police personnel had promised George and Heidi Stipetich that, if they answered questions about the source of the drugs found in their home, no charges would be filed against them. After the Stipetiches fulfilled their part of the agreement, prosecutors charged them anyway. *Id.* at 1294-95. The trial court granted the Stipetiches' motion to dismiss the charges on the basis of the police promise. *Id.* at 1295. This Court ultimately held that the Pittsburgh police department had no authority to bind the Allegheny County District Attorney's Office to a non-prosecution agreement. *Id.* However, this Court opined:

The decisions below, barring prosecution of the Stipetiches, embodied concern that allowing charges to be brought after George Stipetich had performed his part of the agreement by answering questions about sources of the contraband discovered in his residence would be fundamentally unfair because in answering the questions he may have disclosed information that could be used against him. The proper response to this concern is not to bar prosecution; rather, it is to suppress, at the appropriate juncture, any detrimental evidence procured through the inaccurate representation that he would not be prosecuted.

*Id.* at 1296. Although the Superior Court dismissed this passage from *Stipetich* as *dicta*, it found the situation distinguishable in any event inasmuch as former D.A. Castor testified that there was no "agreement" or "quid pro quo" with Cosby, and, therefore, any reliance that Cosby placed upon the district attorney's promise was unreasonable. *Cosby*, 224 A.3d at 416-17.

The Superior Court concluded that it was bound by the trial court's factual findings and by its credibility determinations. The trial court had "determined that Mr. Castor's testimony and, by implication, Attorney Schmitt's testimony (which was premised upon information he indirectly received from Mr. Castor) were not credible." *Id.* at 417. The panel added that the trial court had "found that the weight of the evidence supported its finding that no agreement or grant of immunity was made, and that [Cosby] did not reasonably rely on any overtures by Mr. Castor to that effect when he sat for his civil deposition." *Id.* Thus, the Superior Court discerned no error in the trial court's decision to allow the use of Cosby's deposition testimony against him at trial.[19]

---

[19] In addition to the Rule 404(b) and non-prosecutions claims, the Superior Court rejected a number of other issues raised by Cosby, including an assertion of improper juror bias, a challenge to an allegedly misleading jury instruction, and a contention that SORNA was unconstitutional. *Cosby*, 224 A.3d at 396, 421-431. Because those issues are not relevant to the matters before us, we need not discuss them herein.

## II. Issues:

On June 23, 2020, this Court granted Cosby's petition for allowance of appeal, limited to the following two issues:

(1) Where allegations of uncharged misconduct involving sexual contact with five women (and a de facto sixth) and the use of Quaaludes were admitted at trial through the women's live testimony and [Cosby's] civil deposition testimony despite: (a) being unduly remote in time in that the allegations were more than fifteen years old and, in some instances, dated back to the 1970s; (b) lacking any striking similarities or close factual nexus to the conduct for which [Cosby] was on trial; (c) being unduly prejudicial; (d) being not actually probative of the crimes for which [Cosby] was on trial; and (e) constituting nothing but improper propensity evidence, did the Panel err in affirming the admission of this evidence?

(2) Where: (a) [District Attorney Castor] agreed that [Cosby] would not be prosecuted in order to force [Cosby's] testimony at a deposition in [Constand's] civil action; (b) [the district attorney] issued a formal public statement reflecting that agreement; and (c) [Cosby] reasonably relied upon those oral and written statements by providing deposition testimony in the civil action, thus forfeiting his constitutional right against self-incrimination, did the Panel err in affirming the trial court's decision to allow not only the prosecution of [Cosby] but the admission of [Cosby's] civil deposition testimony?

*Commonwealth v. Cosby*, 236 A.3d 1045 (Pa. 2020) (*per curiam*).[20]

## III. Analysis

We begin with Cosby's second listed issue, because, if he is correct that the Commonwealth was precluded from prosecuting him, then the question of whether the prior bad act testimony satisfied Rule 404(b) will become moot.

On February 17, 2005, then-District Attorney Castor announced to the public, on behalf of the Commonwealth of Pennsylvania, that he would not prosecute Cosby for any offense related to the 2004 sexual abuse that Constand alleged. Constand's potential

---

[20] In his petition, Cosby also sought this Court's review of his claim of improper juror bias and his challenge to the constitutionality of SORNA. We denied *allocatur* as to those two claims.

credibility issues, and the absence of direct or corroborative proof by which to substantiate her claim, led the district attorney to believe that the case presented "insufficient, credible, and admissible evidence upon which any charge could be sustained beyond a reasonable doubt." Press Release, 2/17/2005 (cleaned up). Given his "conclu[sion] that a conviction under the circumstances of this case would be unattainable," D.A. Castor "decline[d] to authorize the filing of criminal charges in connection with this matter." *Id.* In light of the non-prosecution decision, Cosby no longer was exposed to criminal liability relating to the Constand allegations and thus could no longer invoke his Fifth Amendment privilege against compulsory self-incrimination in that regard. With no legal mechanism available to avoid testifying in Constand's civil suit, Cosby sat for depositions and, therein, made a number of statements incriminating himself.

D.A. Castor's declination decision stood fast throughout his tenure in office. When he moved on, however, his successor decided to revive the investigation and to prosecute Cosby. Ruling upon Cosby's challenge to this belated prosecution, the trial court concluded that the former district attorney's promise did not constitute a binding, enforceable agreement. To determine whether Cosby permanently was shielded from prosecution by D.A. Castor's 2005 declination decision, we first must ascertain the legal relationship between D.A. Castor and Cosby. We begin with the trial court's findings.

It is hornbook law that reviewing courts are not fact-finding bodies. *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1199 (Pa. 2001). Appellate courts are limited to determining "whether there is evidence in the record to justify the trial court's findings." *Id.* at 1199 n.6. "If so, this Court is bound by them." *Id.* However, while "we accord deference to a trial court with regard to factual findings, our review of legal conclusions is de novo." *Id.* at n.7 (citation omitted). Indeed, it is a long-standing appellate principle that, "[w]ith respect to [] inferences and deductions from facts and [] conclusions of

law, . . . appellate courts have the power to draw their own inferences and make their own deductions and conclusions." *In re Pruner's Est.*, 162 A.2d 626, 631 (Pa. 1960) (citations omitted).

Here, the trial court presided over the *habeas corpus* hearing, viewing and hearing the witnesses and their testimonies first-hand. From that vantage point, the trial court determined that, as a matter of fact, D.A. Castor had not extended a formal promise to Cosby never to prosecute him, let alone consummated a formal non-prosecution agreement with Cosby. The factual basis for the court's findings was two-fold. First, the court characterized the interaction between the district attorney and Cosby as a failed attempt to reach a statutorily prescribed transactional immunity agreement. Second, the court concluded that the former district attorney's testimony regarding the legal relationship between him and Cosby was inconsistent and "equivocal at best." T.C.O. at 63. Both findings are supported adequately by the record.

Pursuant to 42 Pa.C.S. § 5947, when a prosecutor wishes to formalize an immunity agreement, he or she "may request an immunity order from any judge of a designated court." *Id.* § 5947(b). Presented with such a request, the petitioned court "shall issue such an order," *id.*, upon which a witness "may not refuse to testify based on his privilege against self-incrimination." *Id.* § 5947(c). At the *habeas* hearing, former District Attorney Castor testified that he intended to provide Cosby with transactional immunity. He explained that this conferral was predicated upon the state's common-law authority as a sovereign rather than any statutory provisions or protocols. T.C.O. at 57 (citing N.T., 2/2/2016, at 232, 234, 236). The record does not contradict his testimony. There is no evidence, nor any real contention, that the parties even contemplated a grant of immunity under Section 5947. The trial court's finding that the interaction between D.A. Castor and

Cosby was not a formal attempt to bestow transactional immunity upon Cosby is supported by the record.

The trial court's description of former D.A. Castor's testimony as inconsistent and equivocal finds support in the record as well. At times, the former district attorney was emphatic that he intended his decision not to prosecute Cosby to bind the Commonwealth permanently, provided no substantive changes occurred in the case, such as Cosby confessing to the alleged crimes or proof appearing that Cosby had lied to, or attempted to deceive, the investigators. In addition to the unconditional nature of the press release, former D.A. Castor told then-District Attorney Ferman in his first email to her that he "intentionally and specifically bound the Commonwealth that there would be no state prosecution." N.T., 2/2/2016, Exh. D-5. In his second email to D.A. Ferman, Mr. Castor asserted that, by "signing off" on the press release, he was "stating that the Commonwealth will not bring a case against Cosby for this incident based upon then-available evidence." *Id.,* Exh. D-7.

Further indicative of his intent to forever preclude prosecution of Cosby for the 2004 incident, former D.A. Castor testified that the signed press release was meant to serve as proof for a future civil judge that Cosby would not be prosecuted, thus stripping Cosby of his Fifth Amendment right not to testify. Mr. Castor emphasized that his decision was "absolute that [Cosby] never would be prosecuted." T.C.O. at 52. The former district attorney stressed that his intent was to "absolutely" remove "for all time" the prospect of a prosecution, because, in his view, only a steadfast guarantee would permanently strip Cosby of his right to invoke the Fifth Amendment. N.T., 2/2/2016, at 67. Mr. Castor also expounded upon the purpose of his emails to D.A. Ferman, which he claimed were an attempt to inform her that, while he bound the Commonwealth with regard to the 2004 incident, she was free to prosecute Cosby for any other crimes that she might uncover.

Although former D.A. Castor stated that he intended permanently to bar prosecution of Cosby, he also testified that he sought to confer some form of transactional immunity. In his second email to D.A. Ferman, former district attorney Castor suggested that his intent in "signing off" on the press release was to assure Cosby that nothing that he said in a civil deposition could or would be used against him in a criminal prosecution. N.T., 2/2/2016, Exh. D-7. In the same email, he simultaneously expressed his belief that "a prosecution is not precluded." *Id.* As such, the evidence suggests that D.A. Castor was motivated by conflicting aims when he decided not to prosecute Cosby. On one hand, the record demonstrates that D.A. Castor endeavored to forever preclude the Commonwealth from prosecuting Cosby if Cosby testified in the civil case. On the other hand, the record indicates that he sought to foreclose only the use in a subsequent criminal case of any testimony that Cosby gave in a civil suit.

The trial court was left to resolve these seeming inconsistencies. The court concluded that Cosby and D.A. Castor did not enter into a formal immunity agreement. Because the record supports the trial court's findings in this regard, we are bound by those conclusions. Pertinently, we are bound by the trial court's determination that D.A. Castor's actions amounted only to a unilateral exercise of prosecutorial discretion. This characterization is consistent with the former district attorney's insistence at the *habeas* hearing that what occurred between him and Cosby was not an agreement, a contract, or any kind of *quid pro quo* exchange.

We are not, however, bound by the lower courts' legal determinations that derive from those factual findings. Thus, the question becomes whether, and under what circumstances, a prosecutor's exercise of his or her charging discretion binds future prosecutors' exercise of the same discretion. This is a question of law.

For the reasons detailed below, we hold that, when a prosecutor makes an unconditional promise of non-prosecution, and when the defendant relies upon that guarantee to the detriment of his constitutional right not to testify, the principle of fundamental fairness that undergirds due process of law in our criminal justice system demands that the promise be enforced.

Prosecutors are more than mere participants in our criminal justice system. As we explained in *Commonwealth v. Clancy*, 192 A.3d 44 (Pa. 2018), prosecutors inhabit three distinct and equally critical roles: they are officers of the court, advocates for victims, and administrators of justice. *Id.* at 52. As the Commonwealth's representatives, prosecutors are duty-bound to pursue "equal and impartial justice," *Appeal of Nicely*, 18 A. 737, 738 (Pa. 1889), and "to serve the public interest." *Clancy*, 192 A.3d 52. Their obligation is "not merely to convict," but rather to "seek justice within the bounds of the law." *Commonwealth v. Starks*, 387 A.2d 829, 831 (Pa. 1978).

> As an "administrator of justice," the prosecutor has the power to decide whether to initiate formal criminal proceedings, to select those criminal charges which will be filed against the accused, to negotiate plea bargains, to withdraw charges where appropriate, and, ultimately, to prosecute or dismiss charges at trial. *See, e.g.*, 16 P.S. § 1402(a) ("The district attorney shall sign all bills of indictment and conduct in court all criminal and other prosecutions . . . ."); Pa.R.Crim.P. 507 (establishing the prosecutor's power to require that police officers seek approval from the district attorney prior to filing criminal complaints); Pa.R.Crim.P. 585 (power to move for *nolle prosequi*); *see also* ABA Standards §§ 3-4.2, 3-4.4. The extent of the powers enjoyed by the prosecutor was discussed most eloquently by United States Attorney General (and later Supreme Court Justice) Robert H. Jackson. In his historic address to the nation's United States Attorneys, gathered in 1940 at the Department of Justice in Washington, D.C., Jackson observed that "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous." Robert H. Jackson, The Federal Prosecutor, 31 AM. INST. CRIM. L. & CRIMINOLOGY 3, 3 (1940). In fact, the prosecutor is afforded such great deference that this Court and the Supreme Court of the United States seldom interfere with a prosecutor's charging decision. *See, e.g., United States v. Nixon*, 418 U.S. 683, 693 (1974) (noting that "the Executive Branch has exclusive authority and absolute discretion to decide whether

to prosecute a case"); *Stipetich*, 652 A.2d at 1295 (noting that "the ultimate discretion to file criminal charges lies in the district attorney").

*Clancy*, 192 A.3d at 53 (cleaned up).

As prosecutors are vested with such "tremendous" discretion and authority, our law has long recognized the special weight that must be accorded to their assurances. For instance, in the context of statements made during guilty plea negotiations, the Supreme Court of the United States has held that, as a matter of constitutional due process and as compelled by the principle of fundamental fairness, a defendant generally is entitled to the benefit of assurances made by the prosecutor. *See Santobello v. New York*, 404 U.S. 257 (1971).[21] *Santobello* holds that, "when a plea rests in any significant degree on a promise or agreement by the prosecutor, so that it can be said to be part of the *inducement or consideration*, such promise must be fulfilled." *Id.* at 262 (emphasis added).

This Court has followed suit with regard to prosecutorial inducements made during the guilty plea process, insisting that such inducements comport with the due process guarantee of fundamental fairness. In *Commonwealth v. Zuber*, 353 A.2d 441 (Pa. 1976), during plea negotiations in a murder case, the prosecutor agreed to recommend to the sentencing court that Rickey Zuber receive a sentence of seven to fourteen years in prison if he pleaded guilty. *Id.* at 442-43. The prosecutor also agreed to consent to a request that Zuber's sentence be served concurrently with "back time" that Zuber was required to serve for a parole violation. *Id.* at 443. The prosecutor stated the terms of the agreement on the record, and the trial court accepted the terms of Zuber's guilty plea and

---

[21]    In *Santobello*, the Supreme Court of the United States did not state explicitly that it was premising its holding on due process guarantees. Nevertheless, it is only sensible to read *Santobello*'s holding as resting upon due process principles because—as Justice Douglas noted in his concurring opinion—without a constitutional basis the Court would have lacked jurisdiction over what was otherwise a state law matter. *See Santobello*, 404 U.S., at 266-67 (Douglas, J. concurring).

sentenced Zuber accordingly. However, because the law requires that "back time" sentences and new sentences be served consecutively, Zuber was legally obligated to begin serving his sentences one after the other, instead of simultaneously. *Id.*

Zuber sought post-conviction relief, arguing that the plea as stated in open court had to be enforced, statutory law notwithstanding. On appeal to this Court, Zuber argued that he was "induced by the specific promise made by the Commonwealth," which ultimately turned out to be a "false and empty one." *Id.* We noted that plea bargaining is looked upon favorably and that "the integrity of our judicial process demands that certain safeguards be stringently adhered to so that the resultant plea as entered by a defendant and accepted by the trial court will always be one made voluntarily and knowingly, with a full understanding of the consequences to follow." *Id.*

> [T]here is an affirmative duty on the part of the prosecutor to honor any and all promises made in exchange for a defendant's plea. Our courts have demanded strict compliance with that duty in order to avoid any possible perversion of the plea bargaining system, evidencing the concern that a defendant might be coerced into a bargain or fraudulently induced to give up the very valued constitutional guarantees attendant the right to trial by jury.
>
> Therefore, in Pennsylvania, it is well settled that where a plea bargain has been entered into and is violated by the Commonwealth, the defendant is entitled, at the least, to the benefit of the bargain.

*Id.* at 444 (cleaned up).

We then turned to the remedy to which Zuber was entitled, which was problematic because enforcement of the plea necessarily meant compelling an outcome that was prohibited by statute. Nonetheless, because, *inter alia*, Zuber had "reasonably relied upon the advice of his counsel and the expression of that specific promise stated in open court by the assistant district attorney," *id.* at 445, he was entitled to the benefit of the bargain. Thus, we modified Zuber's sentence by lowering the minimum range to reflect

the point at which Zuber would have been eligible for parole had the original bargain been enforceable by law. *Id.* at 446.

Interactions between a prosecutor and a criminal defendant, including circumstances where the latter seeks enforcement of some promise or assurance made by the former, are not immune from the dictates of due process and fundamental fairness. The contours and attendant obligations of such interactions also can involve basic precepts of contract law, which inform the due process inquiry. The applicability of contract law to aspects of the criminal law has been recognized by the Supreme Court of the United States, *see Puckett v. United States*, 556 U.S. 129, 137 (2009), by the United States Court of Appeals for the Third Circuit, *see McKeever v. Warden SCI-Graterford*, 486 F.3d 81, 86 (3d Cir. 2007), and by this Court. *See Commonwealth v. Martinez*, 147 A.3d 517, 531 (Pa. 2016). In order to succeed on a claim of promissory estoppel, the aggrieved party must prove that: (1) the promisor acted in a manner that he or she should have reasonably expected to induce the other party into taking (or not taking) certain action; (2) the aggrieved party actually took such action; and (3) an injustice would result if the assurance that induced the action was not enforced. *See Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000).

In *Martinez*, we reexamined the enforceability of terms of plea agreements made by prosecutors pertaining to the applicability of sexual offender registration obligations. There, three defendants entered into plea bargains with the Commonwealth, each of which was formulated in a way that either limited or eliminated the defendants' obligations under the then-applicable sexual offender registration statute. *Martinez*, 147 A.3d at 521-22. However, after some time, our General Assembly enacted the first version of SORNA, which fundamentally altered the registration and reporting obligations of sexual offenders, including those of the three offenders in *Martinez*. Each defendant was notified by the

Pennsylvania State Police that he or she was subject to the intervening statute and thus had to comply with the new obligations under SORNA, even though those obligations contradicted the terms of each of their plea deals. *Id.* at 522-523.

Each of the three offenders filed an action seeking the enforcement of the terms of his guilty plea, notwithstanding the fact that those terms conflicted with the newly-enacted statute. *Id.* at 523-24. Citing *Santobello*, *Zuber*, *Commonwealth v. Hainesworth*, 82 A.3d 444 (Pa. Super. 2013) (*en banc*), and other decisions, this Court held that the offenders were entitled to specific performance of the terms of the plea bargains to which the prosecutors had agreed. *Martinez*, 147 A.3d at 531-32. We held that, once a bargained term is enveloped within a plea agreement, a defendant "is entitled to the benefit of his bargain through specific performance of terms of the plea agreement." *Id.* at 533.

The applicability of contract law principles to criminal negotiations is not limited to the plea bargaining process. *See United States v. Carrillo*, 709 F.2d 35 (9th Cir. 1983) (holding that fundamental fairness requires a prosecutor to uphold his or her end of a non-prosecution agreement). For instance, the United States Court of Appeals for the Third Circuit has explained that, like plea agreements, non-prosecution agreements are binding contracts that must be interpreted according to general principles of contract law, guided by "special due process concerns." *United States v. Baird*, 218 F.3d 221, 229 (3d Cir. 2000) (citation omitted). And, in *Commonwealth v. Ginn*, 587 A.2d 314 (Pa. Super. 1991), our Superior Court similarly held that non-prosecution agreements are akin to plea agreements, necessitating the application of contract law principles to prevent prosecutors from violating the Commonwealth's promises or assurances. *Id.* at 316-17.

Under some circumstances, assurances given by prosecutors during plea negotiations, even unconsummated ones, may be enforceable on equitable grounds

rather than on contract law principles. *Government of Virgin Islands v. Scotland*, 614 F.2d 360 (3d Cir. 1980), is instructive. In that case, the parties had reached a tentative, preliminary plea agreement. But before the defendant could formally enter the plea, the prosecutor attempted to add another term to the deal. *Id.* at 361-62. The defendant rejected the new term and sought specific performance of the original, unconsummated agreement. *Id.* The district court denied his request. The Circuit Court of Appeals affirmed, holding that, because the agreement was not formalized and accepted by the court, the defendant was not entitled to specific performance under a contract law theory. *Id.* at 362. The appellate court noted that, absent detrimental reliance upon the prosecutor's offer, a defendant's due process rights were sufficiently safeguarded by his right to a jury trial. *Id.* at 365. The court cautioned, however, that, by contrast, when a "defendant detrimentally relies on the government's promise, the resulting harm from this induced reliance implicates due process guarantees." *Id.*[22]

Considered together, these authorities obligate courts to hold prosecutors to their word, to enforce promises, to ensure that defendants' decisions are made with a full understanding of the circumstances, and to prevent fraudulent inducements of waivers of one or more constitutional rights. Prosecutors can be bound by their assurances or decisions under principles of contract law or by application of the fundamental fairness considerations that inform and undergird the due process of law. The law is clear that, based upon their unique role in the criminal justice system, prosecutors generally are bound by their assurances, particularly when defendants rely to their detriment upon those guarantees.

---

[22]     Ultimately, the court did not grant the defendant relief under a theory of detrimental reliance because there was "no claim in this case of such reliance." *Scotland*, 614 F.2d at 365.

There is no doubt that promises made during plea negotiations or as part of fully consummated plea agreements differ in kind from the unilateral discretion exercised when a prosecutor declines to pursue criminal charges against a defendant. As suggested by the trial court in the present case, such an exercise of discretion is not *per se* enforceable in the same way that a bargained-for exchange is under contract law. The prosecutor enjoys "tremendous" discretion to wield "the power to decide whether to initiate formal criminal proceedings, to select those criminal charges which will be filed against the accused, to negotiate plea bargains, to withdraw charges where appropriate, and, ultimately, to prosecute or dismiss charges at trial." *Clancy*, 192 A.3d at 53. Unless patently abused, this vast discretion is exercised generally beyond the reach of judicial interference. *See Stipetich*, 652 A.2d at 1295 (noting that "the ultimate discretion to file criminal charges lies in the district attorney").

While the prosecutor's discretion in charging decisions is undoubtedly vast, it is not exempt from basic principles of fundamental fairness, nor can it be wielded in a manner that violates a defendant's rights. The foregoing precedents make clear that, at a minimum, when a defendant relies to his or her detriment upon the acts of a prosecutor, his or her due process rights are implicated. *See, e.g.*, *Santobello, Baird,* and *Scotland*, *supra*.

The Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution mandate that all interactions between the government and the individual are conducted in accordance with the protections of due process. *See Commonwealth v. Sims*, 919 A.2d 931, 941 n.6 (Pa. 2007) (noting that federal and state due process principles generally are understood as operating co-extensively). We have explained that review of a due process claim "entails an assessment as to whether the challenged proceeding or conduct offends some principle of justice so rooted in the

traditions and conscience of our people as to be ranked as fundamental and that defines the community's sense of fair play and decency." *Commonwealth v. Kratsas*, 764 A.2d 20, 27 (Pa. 2001) (cleaned up). Due process is a universal concept, permeating all aspects of the criminal justice system. Like other state actors, prosecutors must act within the boundaries set by our foundational charters. Thus, we discern no cause or reason, let alone any compelling one, to waive the prosecution's duty to comply with due process simply because the act at issue is an exercise of discretion, *e.g.*, whether or not to charge a particular suspect with a crime.

That is not to say that each and every exercise of prosecutorial discretion with regard to charging decisions invites a due process challenge. Charging decisions inhere within the vast discretion afforded to prosecutors and are generally subject to review only for arbitrary abuses. A prosecutor can choose to prosecute, or not. A prosecutor can select the charges to pursue, and omit from a complaint or bill of information those charges that he or she does not believe are warranted or viable on the facts of the case. A prosecutor can also condition his or her decision not to prosecute a defendant. For instance, a prosecutor can decide initially not to prosecute, subject to possible receipt or discovery of new inculpatory evidence. Or, a prosecutor can choose not to prosecute the defendant at the present time, but may inform the defendant that the decision is not final and that the prosecutor may change his or her mind within the period prescribed by the applicable statute of limitations. Similarly, there may be barriers to a prosecution, such as the unavailability of a witness or evidence, which subsequently may be removed, thus enabling a prosecution to proceed. Generally, no due process violation arises from these species of discretionary decision-making, and a defendant is without recourse to seek the enforcement of any assurances under such circumstances.

An entirely different situation arises when the decision not to prosecute is unconditional, is presented as absolute and final, or is announced in such a way that it induces the defendant to act in reliance thereupon. When a non-prosecution decision is conveyed in such a way, and when a defendant, having no indication to the contrary, detrimentally relies upon that decision, due process may warrant preclusion of the prosecution. Numerous state and federal courts have found that a defendant's detrimental reliance upon the government's assurances during the plea bargaining phase both implicates his due process rights and entitles him to enforcement even of unconsummated agreements. The cases are legion.[23]

---

[23] *See, e.g., State v. Francis*, 424 P.3d 156, 160 (Utah 2017) (holding that, "[w]hen a defendant has reasonably and detrimentally relied on a plea agreement, the State should not be able to withdraw a plea agreement just because it has not yet been presented to the district court"); *State v. Johnson*, 360 S.W.3d 104, 115 (Ark. 2010) (holding that, "when the State has entered into an agreement not to prosecute with a prospective defendant and the defendant has performed and acted to his detriment or prejudice in reliance upon that agreement, the government must be required to honor such an agreement."); *People v. Rhoden*, 89 Cal. Rptr.2d 819, 824 (Cal. App. 4th Dist. 1999) (explaining "unexecuted plea bargains generally do not involve constitutional rights absent detrimental reliance on the bargain"); *United States v. Streebing*, 987 F.2d 368, 372-73 (6th Cir. 1993) (holding that the defendant had to demonstrate, *inter alia*, that he had relied upon the government's promise to his detriment before the promise would be enforceable); *United States v. Savage*, 978 F.2d 1136, 1138 (9th Cir. 1992) (explaining that a defendant's detrimental reliance is an exception to the general rule that defendants are not entitled to enforcement of unconsummated plea agreements); *State v. Parkey,* 471 N.W.2d 896, 898 (Iowa App. 1991) (finding that, in the absence of a showing that the defendant detrimentally relied upon an agreement with the prosecutor, dismissal was not warranted); *Rowe v. Griffin*, 676 F.2d 524, 528 (11th Cir. 1982) (stating that, when a promise induces a defendant to waive his Fifth Amendment rights by testifying or otherwise cooperating with the government to his detriment, due process requires that the prosecutor's promise be fulfilled); *People v. Reagan*, 235 N.W.2d 581, 587 (Mich. 1975) (noting that, where the defendant was prejudiced by submitting to a polygraph in exchange for an agreement that his prosecution would be dismissed, trial court erred in refusing to enforce the agreement).

That is what happened in this case. There has been considerable debate over the legal significance of District Attorney Castor's publicly announced decision not to prosecute Cosby in 2005. Before the trial court, the Superior Court, and now this Court, the parties have vigorously disputed whether D.A. Castor and Cosby reached a binding agreement, whether D.A. Castor extended an enforceable promise, or whether any act of legal significance occurred at all. There is testimony in the record that could support any of these conclusions. The trial court—the entity charged with sorting through those facts—found that D.A. Castor made no agreement or overt promise.

Much of that debate, and the attendant factual conclusions, were based upon the apparent absence of a formal agreement and former D.A. Castor's various efforts to defend and explain his actions ten years after the fact. As a reviewing court, we accept the trial court's conclusion that the district attorney's decision was merely an exercise of his charging discretion.[24] As we assess whether that decision, and the surrounding

---

[24] The dissent agrees—as do we —with the trial court's conclusion that D.A. Castor's decision not to prosecute was, at its core, an exercise of the inherent charging discretion vested in district attorneys. *See* D.O. at 1. But the dissent would simply end the analysis there. In the dissent's view, once a decision is deemed to fall within a prosecutor's discretion, that decision "in no way" can bind the actions of future elected prosecutors. Respectfully, this perspective overlooks the verity that not all decisions are the same. As to routine discretionary decisions, the dissent may be correct. But as we explain throughout this opinion, what occurred here was anything but routine. Here, D.A. Castor's exercise of discretion was made deliberately to induce the deprivation of a fundamental right. The typical decision to prosecute, or not to prosecute, is not made for the purpose of extracting incriminating information from a suspect when there exists no other mechanism to do so.

The dissent would amalgamate and confine all "present exercise[s] of prosecutorial discretion" within a single, non-binding, unenforceable, and unreviewable category. *Id.* We decline to endorse this blanket approach, as such decisions merit, and indeed require, individualized evaluation. To rule otherwise would authorize, if not encourage, prosecutors to choose temporarily not to prosecute, obtain incriminating evidence from the suspect, and then reverse course with impunity. Due process necessarily requires that court officials, particularly prosecutors, be held to a higher standard. This is particularly so in circumstances where the prosecutor's decision is crafted specifically to

circumstances, implicated Cosby's due process rights, former D.A. Castor's *post-hoc* attempts to explain or characterize his actions are largely immaterial. The answer to our query lies instead in the objectively indisputable evidence of record demonstrating D.A. Castor's patent intent to induce Cosby's reliance upon the non-prosecution decision.

In January and February of 2005, then-D.A. Castor led an investigation into Constand's allegations. When that investigation concluded, Mr. Castor decided that the case was saddled with deficiencies such that proving Cosby's guilt beyond a reasonable doubt was unlikely, if not impossible. For those reasons, D.A. Castor decided not to prosecute Cosby. To announce his decision, the district attorney elected to issue a signed press release—an uncommon tactic in the typical case, but not necessarily so in cases of high public profile or interest.

In that press statement, D.A. Castor explained the extent and nature of the investigation and the legal rules and principles that he considered. He then announced that he was declining to prosecute Cosby. The decision was not conditioned in any way, shape, or form. D.A. Castor did not say that he would re-evaluate this decision at a future date, that the investigation would continue, or that his decision was subject to being overturned by any future district attorney.

There is nothing from a reasonable observer's perspective to suggest that the decision was anything but permanent. The trial court found contrary indicia in the latter portion of the press release, where Mr. Castor "cautioned all parties to this matter that [District Attorney Castor] will reconsider this decision should the need arise," Press Release, 2/17/2005; N.T., 2/2/2016, Exh. D-4. The trial court's narrow interpretation of

_____

induce a defendant to forfeit a constitutional right, and where the defendant has relied upon that decision to his detriment. The dissent's approach would turn a blind eye to the reality of such inducements. Due process does not.

"this decision" is possible only when this sentence is read in isolation.[25] The court ignored what came before and after, omitting all relevant and necessary context. The entire passage reads as follows:

> Because a civil action with a much lower standard for proof is possible, the District Attorney renders no opinion concerning the credibility of any party involved so as to not contribute to the publicity and taint potential jurors. The District Attorney does not intend to expound publicly on the details of his decision for fear that his opinions and analysis might be given undue weight by jurors in any contemplated civil action. *District Attorney Castor cautions all parties to this matter that he will reconsider this decision should the need arise.* Much exists in this investigation that could be used (by others) to portray persons on both sides of the issue in a less than flattering light. The District Attorney encourages the parties to resolve their dispute from this point forward with a minimum of rhetoric.

*Id.* (emphasis added).

---

[25] There is no doubt that there are two decisions at issue: the decision not to prosecute and the decision not to discuss that choice in public. The dissent would endorse the trial court's selective interpretation of D.A. Castor's language in the press release, finding at a minimum that D.A. Castor's assertion that he would reconsider the "decision" is ambiguous. But a plain reading of the release belies such a construction. Like the trial court's interpretation of the relevant paragraph of the press release, the dissent's finding of ambiguity can result only when one overlooks the context and surrounding statements quite entirely. D.A. Castor stated that he did not intend to discuss the details of his decision not to prosecute. In the very next sentence, D.A. Castor stated that he would reconsider "this decision" if the need arose. In context, "this decision" must naturally refer to the decision not to discuss the matter with the public. This is so because announcing that particular decision was the very purpose of the immediately preceding statement, and the subject sentence naturally modifies that prior statement. D.A. Castor already had stated earlier in the press release that he had decided not to prosecute Cosby. Thus, when D.A. Castor referred to "this decision" in the particular paragraph under examination, he was referring not to a decision addressed much earlier in the press release but rather to the decision that he had stated for the first time in the immediately preceding sentence. Even more compelling is the fact that the entirety of the paragraph relates to D.A. Castor's concern about the potential effect that any public statements that he would make might have on jurors empaneled in a civil case. Nothing at all in that paragraph pertains to the decision not to prosecute Cosby. As noted, D.A. Castor already had addressed the non-prosecution decision. There is no support for the notion that D.A. Castor was referring to his decision not to prosecute Cosby in the middle of a paragraph directed exclusively to: (1) the potential impact that any public explication by D.A. Castor might have upon the fairness of a civil case; and (2) D.A. Castor's derivative decision not to discuss the matter publicly in order to avoid that potential impact.

When we review the statement in its full context, it is clear that, when D.A. Castor announced that he "will reconsider *this decision* should the need arise," the decision to which he was referring was his decision not to comment publicly "on the details of his [charging] decision for fear that his opinions and analysis might be given undue weight by jurors in any contemplated civil action." The entire paragraph addresses the district attorney's concern that he might inadvertently taint a potential civil jury pool by making public remarks about the credibility of the likely parties in that highly anticipated case. Then-D.A. Castor expressly stated that he could change his mind on *that* decision only. Nothing in this paragraph pertains to his decision not to prosecute Cosby. The trial court's conclusion is belied by a plain reading of the entire passage.

Our inquiry does not end there. D.A. Castor's press release, without more, does not necessarily create a due process entitlement. Rather, the due process implications arise because Cosby detrimentally relied upon the Commonwealth's decision, which was the district attorney's ultimate intent in issuing the press release. There was no evidence of record indicating that D.A. Castor intended anything other than to induce Cosby's reliance. Indeed, the most patent and obvious evidence of Cosby's reliance was his counseled decision to testify in four depositions in Constand's civil case without ever invoking his Fifth Amendment rights.

The Fifth Amendment to the United States Constitution, which is applicable to the States via incorporation through the Fourteenth Amendment, commands that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The right to refuse to incriminate oneself is an "essential mainstay" of our constitutional system of criminal justice. *Malloy v. Hogan*, 378 U.S. 1, 7 (1964). The privilege constitutes an essential restraint upon the power of the government, and stands as an indispensable rampart between that government and the governed. The Fifth

Amendment's self-incrimination clause "is not only a protection against conviction and prosecution but a safeguard of conscience and human dignity and freedom of expression as well." *Ullmann v. United States*, 350 U.S. 422, 445 (1956) (Douglas, J., dissenting).

We recently discussed the centrality of the privilege against compulsory self-incrimination in the American concept of ordered liberty in *Commonwealth v. Taylor*, 230 A.3d 1050 (Pa. 2020). There, we noted that certain rights, such as those enshrined in the Fifth Amendment, are among those privileges "whose exercise a State may not condition by the exaction of a price." *Id.* at 1064 (quoting *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967)). To ensure that these fundamental freedoms are "scrupulously observed," we emphasized that "it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon," *id.* at 1063-64 (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886)), and that "the Fifth Amendment is to be "broad[ly] constru[ed] in favor of the right which it was intended to secure." *Id.* at 1064 (quoting *Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892), *Boyd*, 116 U.S. at 635, and *Quinn v. United States*, 349 U.S. 155, 162 (1955)). We stressed that "[t]he value of constitutional privileges is largely destroyed if persons can be penalized for relying on them." *Id.* at 1064 (quoting *Grunewald v. United States*, 353 U.S. 391, 425 (1957) (Black, J., concurring).[26]

The right against compulsory self-incrimination accompanies a person wherever he goes, no matter the legal proceeding in which he participates, unless and until "the potential exposure to criminal punishment no longer exists." *Taylor*, 230 A.3d at 1065. It

---

[26] To that end, the application of the privilege against self-incrimination is not limited to criminal matters. Its availability "does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *Id.* (quoting *Application of Gault*, 387 U.S. 1, 49 (1967)). "The privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory." *Gault*, 387 U.S. at 49.

is indisputable that, in Constand's civil case, Cosby was entitled to invoke the Fifth Amendment. No court could have forced Cosby to testify in a deposition or at a trial so long as the potential for criminal charges remained. Here, however, when called for deposition, Cosby no longer faced criminal charges. When compelled to testify, Cosby no longer had a right to invoke his right to remain silent.

Cosby was forced to sit for four depositions. That he did not—and could not— choose to remain silent is apparent from the record. When Cosby attempted to decline to answer certain questions about Constand, Constand's attorneys obtained a ruling from the civil trial judge forcing Cosby to answer. Most significantly, Cosby, having maintained his innocence in all matters and having been advised by a number of attorneys, provided critical evidence of his recurring history of supplying women with central nervous system depressants before engaging in (allegedly unwanted) sexual activity with them—the very assertion that undergirded Constand's criminal complaint.

The trial court questioned whether Cosby believed that he no longer had a Fifth Amendment right to invoke during the civil proceedings, or whether he would have invoked that right had he still possessed it. The court noted that Cosby voluntarily had submitted to a police interview and had provided the police with a consent-based defense. Cosby repeated this narrative in his depositions. The court found no reason to believe that Cosby would not continue to cooperate as he had, and, thus, discerned no reason for him to invoke the Fifth Amendment. In other words, it was not that the trial court surmised that Cosby had no privilege against compulsory self-incrimination to invoke, but rather that Cosby simply chose not to invoke it.

The trial court's conjecture was legally erroneous. The trial court surmised that, although Cosby repeatedly told an exculpatory, consent-based version of the January 2004 incident, he naturally would have been willing to offer inculpatory information about

himself as well. Assuming that a person validly possesses the right to refrain from giving evidence against himself, he may invoke that right "at any time." *See Miranda v. Arizona*, 384 U.S. 436, 473 (1966); *Commonwealth v. Dulaney*, 295 A.2d 328, 330 (Pa. 1972). The fact that Cosby did not assert any right to remain silent to the police or while sitting for the depositions is of no moment. Had his right to remain silent not been removed by D.A. Castor's decision, Cosby would have been at liberty to invoke that right at will. That Cosby did not do so at other junctures is not proof that he held the right but elected not to invoke it, as the trial court evidently reasoned. To assume an implicit waiver of the right violates a court's "duty . . . to be watchful for the constitutional rights of the citizen," and to construe the existence of such rights broadly. *Taylor*, 230 A.3d at 1064 (quoting *Boyd*, *supra*).

These legal commandments compel only one conclusion. Cosby did not invoke the Fifth Amendment before he incriminated himself because he was operating under the reasonable belief that D.A. Castor's decision not to prosecute him meant that "the potential exposure to criminal punishment no longer exist[ed]." *Id.* at 1065. Cosby could not invoke that which he no longer possessed, given the Commonwealth's assurances that he faced no risk of prosecution. Not only did D.A. Castor's unconditional decision not to prosecute Cosby strip Cosby of a fundamental constitutional right, but, because he was forced to testify, Cosby provided Constand's civil attorneys with evidence of Cosby's past use of drugs to facilitate his sexual exploits. Undoubtedly, this information hindered Cosby's ability to defend against the civil action, and led to a settlement for a significant amount of money. We are left with no doubt that Cosby relied to his detriment upon the district attorney's decision not to prosecute him. The question then becomes whether that reliance was reasonable. Unreasonable reliance warrants no legal remedy.

We already have determined that Cosby in fact relied upon D.A. Castor's decision. We now conclude that Cosby's reliance was reasonable, and that it also was reasonable for D.A. Castor to expect Cosby to so rely. The record establishes without contradiction that depriving Cosby of his Fifth Amendment right was D.A. Castor's intended result.[27] His actions were specifically designed to that end. The former district attorney may have equivocated or contradicted himself years later with regard to *how* he endeavored to achieve that result, but there has never been any question as to what he intended to achieve. There can be no doubt that, by choosing not to prosecute Cosby and then

---

[27] The dissent asserts that we have predicated our decision upon the existence of an "unwritten promise," which was rejected by the trial court's credibility findings. D.O. at 3. To the contrary. As we explained earlier, we have accepted the trial court's findings in this regard, and those findings, which are supported by the record, are binding on this Court. *See*, *supra*, page 48 (citing *O'Rourke*, 778 A.2d at 1199 (Pa. 2001)). However, our deference is limited to the factual findings only; we may draw our own inferences therefrom and reach our own legal conclusions. *See In re Pruner's Est.*, 162 A.2d at 631. Thus, the trial court's factual finding that no formal bargained-for-exchange, written or unwritten, occurred does not constrain our legal analysis, nor does it in any way serve to immunize D.A. Castor's actions from constitutional scrutiny. That there was no formal promise does not mean that Cosby no longer had due process rights.

The trial court's credibility finding regarding the existence *vel non* of a particular promise does not allow us to ignore the remainder of the overwhelming evidence of record. The record firmly establishes that D.A. Castor's desired result was to strip Cosby of his Fifth Amendment rights. This patent and developed fact stands separate and apart from the trial court's finding that D.A. Castor never extended a formal promise.

The dissent would ignore the undeniable reality that Cosby relied to his detriment upon D.A. Castor's decision. The dissent does so by shifting the perspective from D.A. Castor's actions to Cosby's, focusing in particular upon the fact that Cosby did not record the purported agreement or reduce it to writing. As we note in this opinion, in this context, neither a promise, nor an agreement, nor a contract, nor evidence of reliance derives legal validity only upon being recorded or upon written materialization. The law knows no such prerequisite, and Cosby cannot be punished for failing to comply with a legal requirement that does not exist. The proof of Cosby's reliance is plain on the face of the record. It is the fact that, upon the advice and assistance of counsel, Cosby sat for four depositions and incriminated himself, obviously a decision made after and in direct reliance upon D.A. Castor's decision.

announcing it publicly, D.A. Castor reasonably expected Cosby to act in reliance upon his charging decision.

We cannot deem it unreasonable to rely upon the advice of one's attorneys. The constitutional guarantee of the effective assistance of counsel is premised, in part, upon the complexities that inhere in our criminal justice system. A criminal defendant confronts a number of important decisions that may result in severe consequences to that defendant if, and when, they are made without a full understanding of the intricacies and nuances of the ever-changing criminal law. As Justice Black explained in *Johnson v. Zerbst*, 304 U.S. 458 (1938):

> [The right to counsel] embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel. That which is simple, orderly, and necessary to the lawyer to the untrained layman may appear intricate, complex, and mysterious. Consistently with the wise policy of the Sixth Amendment and other parts of our fundamental charter, this Court has pointed to the humane policy of modern criminal law, which now provides that a defendant, if he be poor, may have counsel furnished [to] him by the state, not infrequently more able than the attorney for the state.'

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defence, even though he [may] have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him.

*Id.* at 462-63 (cleaned up). Not only was Cosby's reliance upon the conclusions and advice of his attorneys reasonable, it was consistent with a core purpose of the right to counsel.

To hold otherwise would recast our understanding of reasonableness into something unrecognizable and unsustainable under our law. If Cosby's reliance was unreasonable, as found by the lower courts and as suggested by the Commonwealth, then reasonableness would require a defendant in a similar position to disbelieve an elected district attorney's public statement and to discount the experience and wisdom of his own counsel. This notion of reasonableness would be manifestly unjust in this context. Defendants, judges, and the public would be forced to assume fraud or deceit by the prosecutor. The attorney-client relationship would be predicated upon mistrust, and the defendant would be forced to navigate the criminal justice process on his own, despite the substantial deficit in the critical knowledge that is necessary in order to do so, as so compellingly explained by Justice Black.

Such an understanding of reasonableness is untenable. Instead of facilitating the right to counsel, it undermines that right. We reject this interpretation. We find nothing unreasonable about Cosby's reliance upon his attorneys and upon D.A. Castor's public announcement of the Commonwealth's charging decision.

The trial court alternatively suggested that Cosby's belief that he would never be prosecuted, thus stripping him of his Fifth Amendment rights, based upon little more than a press release, was unreasonable because neither Cosby nor his attorneys demanded that the terms of any offers or assurances by D.A. Castor be reduced to writing. This reasoning is unpersuasive. Neither the trial court, nor the Commonwealth for that matter, cites any legal principle that requires a prosecutor's assurances to be memorialized in writing in order to warrant reasonable reliance. We decline to construe as unreasonable the failure to do that which the law does not require.

It also has been suggested that the level of the defendant's sophistication is a relevant factor in assessing whether his reliance upon a prosecutor's decision was

reasonable. Such a consideration is both impractical and unfair. There is no equitable method of assessing a particular defendant's degree of sophistication. Any attempt would be an arbitrary line-drawing exercise that unjustifiably would deem some sophisticated and some not. Nor are there any objective criteria that could be used to make that assessment accurately. Would sophistication for such purposes be established based upon one's ability to hire one or more attorneys? By the level of education attained by the defendant? Or perhaps by the number of times the defendant has participated in the criminal justice system? There is no measure that could justify assessing reasonableness based upon the so-called sophistication of the defendant.

The contours of the right to counsel do not vary based upon the characteristics of the individual seeking to invoke it. Our Constitutions safeguard fundamental rights equally for all. The right to counsel applies with equal force to the sophisticated and the unsophisticated alike. The most experienced defendant, the wealthiest suspect, and even the most-seasoned defense attorney are each entitled to rely upon the advice of their counsel. Notwithstanding Cosby's wealth, age, number of attorneys, and media savvy, he, too, was entitled to rely upon the advice of his counsel. No level of sophistication can alter that fundamental constitutional guarantee.

In accordance with the advice of his attorneys, Cosby relied upon D.A. Castor's public announcement that he would not be prosecuted. His reliance was reasonable, and it resulted in the deprivation of a fundamental constitutional right when he was compelled to furnish self-incriminating testimony. Cosby reasonably relied upon the Commonwealth's decision for approximately ten years. When he announced his declination decision on behalf of the Commonwealth, District Attorney Castor knew that Cosby would be forced to testify based upon the Commonwealth's assurances. Knowing that he induced Cosby's reliance, and that his decision not to prosecute was designed to

do just that, D.A. Castor made no attempt in 2005 or in any of the ten years that followed to remedy any misperception or to stop Cosby from openly and detrimentally relying upon that decision.  In light of these circumstances, the subsequent decision by successor D.A.s to prosecute Cosby violated Cosby's due process rights.  No other conclusion comports with the principles of due process and fundamental fairness to which all aspects of our criminal justice system must adhere.[28]

Having identified a due process violation here, we must ascertain the remedy to which Cosby is entitled.  We note at the outset that specific performance does not automatically apply in these circumstances.  As a general rule, specific performance is reserved for remedying an injured party to a fully consummated agreement, such as an agreed-upon and executed plea bargain.  *Commonwealth v. Spence*, 627 A.2d 1176, 1184 (Pa. 1993).  "'Specific performance' is a traditional contract remedy that is available when monetary damages are inadequate."  *Martinez*, 147 A.3d at 532 (citing BLACK'S LAW DICTIONARY 1425 (8th ed. 2004) (defining "specific performance" as, inter alia, "a court-ordered remedy that requires precise fulfillment of a legal or contractual obligation when monetary damages are inappropriate or inadequate")).

This does not mean that specific performance is unavailable entirely.  It only means that the remedy does not naturally flow to someone under these circumstances as an automatic consequence of contract law.  Specific performance is awarded only when equity and fundamental fairness command it.  *See Scotland*, at 614 F.2d at 365 (stating that, if "the defendant detrimentally relies on the government's promise, the resulting harm from this induced reliance implicates due process guarantees"); *see also Commonwealth v. Mebane*, 58 A.3d 1243 (Pa. Super. 2012) (upholding trial court ruling that fundamental

---

[28]     *See Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004) ("Substantive due process is the esoteric concept interwoven within our judicial framework to guarantee fundamental fairness and substantial justice . . . .") (cleaned up).

fairness required enforcement of the prosecution's plea offer that was later withdrawn, where the defendant detrimentally relied upon the offer); *Commonwealth v. McSorley*, 485 A.2d 15, 20 (Pa. Super. 1984), *aff'd,* 506 A.2d 895 (Pa. 1986) (*per curiam*) (enforcing an incomplete agreement based upon detrimental reliance). As noted earlier, the principle of fundamental fairness, as embodied in our Constitutions, requires courts to examine whether the challenged "conduct offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental and that defines the community's sense of fair play and decency." *Kratsas*, 764 A.2d at 27.

In our view, specific performance of D.A. Castor's decision, in the form of barring Cosby's prosecution for the incident involving Constand, is the only remedy that comports with society's reasonable expectations of its elected prosecutors and our criminal justice system. It bears repeating that D.A. Castor intended his charging decision to induce the waiver of Cosby's fundamental constitutional right, which is why the prosecutor rendered his decision in a very public manner. Cosby reasonably relied to his detriment upon that decade-old decision when he declined to attempt to avail himself of his privilege against compulsory self-incrimination and when he provided Constand's civil attorneys with inculpatory statements. Under these circumstances, neither our principles of justice, nor society's expectations, nor our sense of fair play and decency, can tolerate anything short of compelling the Montgomery County District Attorney's Office to stand by the decision of its former elected head.

In *Stipetich,* we briefly contemplated a remedy for the breach of a defective non-prosecution agreement. In that case, Stipetich agreed with the police that, if he revealed his source for obtaining drugs, no charges would be filed against him or his wife. *Stipetich*, 652 A.2d at 1294-95. Even though Stipetich fulfilled his end of the bargain, charges still were filed against him and his wife. *Id.* at 1295. The Stipetiches sought

enforcement of the non-prosecution agreement with the police. This Court found that the non-prosecution agreement was invalid, because the police did not have the authority to make it. Only a prosecutor holds that power. *Id.*

We recognized that what befell the Stipetiches may have been "fundamentally unfair," particularly if their discussions with the police produced additional evidence of criminality, including possibly self-incriminating statements. *Id.* at 1296. In *dicta*, we suggested that the remedy might be to suppress the evidence or statements that were obtained after the police purported to bind the Commonwealth in a non-prosecution agreement. *Id.*

This remedy is insufficient here, for a number of reasons. First, as noted, the remedy statement was *dicta*, and is not the law in Pennsylvania. Second, the circumstances that led to the suggestion of that remedy are markedly different than those that occurred in the present case. In *Stipetich*, the agreement was formulated with arresting officers, who lacked the authority to make the promise not to prosecute. Here, conversely, the non-prosecution decision was made by the elected District Attorney of Montgomery County, whose public announcement of that decision was fully within his authority, and was objectively worthy of reasonable reliance. Finally, a one-size-fits-all remedy does not comport with the individualized due process inquiry that must be undertaken. As outlined above, a court must ascertain, contemplating the individual circumstances of each case, the remedy that accords with the due process of law. In some instances, suppression of evidence may be an adequate remedy; in others, only specific enforcement will suffice.

Here, only full enforcement of the decision not to prosecute can satisfy the fundamental demands of due process. *See Rowe*, 676 F.2d at 528 (explaining that, when a promise induces a defendant to waive his Fifth Amendment rights by testifying or

otherwise cooperating with the government to his detriment, due process requires that the prosecutor's promise be fulfilled). In light of the extent and duration of Cosby's reliance, induced as intended by then-District Attorney Castor, no other remedy will do. Anything less under these circumstances would permit the Commonwealth to extract incriminating evidence from a defendant who relies upon the elected prosecutor's words, actions, and intent, and then use that evidence against that defendant with impunity.

The circumstances before us here are rare, if not entirely unique. While this controversy shares some features of earlier cases that contemplate the constitutional role of prosecutors, that import contract principles into the criminal law, and that address the binding nature of prosecutorial promises in plea agreements and in other situations—as well as breaches of those promises—there are no precedents directly on point that would make the remedy question an easy one. As the concurring and dissenting opinion ("C.D.O.") observes, the circumstances of this case present a "constellation of . . . unusual conditions."[29] It is not at all surprising, then, that a reasonable disagreement arises regarding the remedy that must be afforded for what we and the C.D.O. agree was a violation of Cosby's due process rights.

In our respectful judgment, the C.D.O.'s proposed remedy, a third criminal trial of Cosby—albeit one without his deposition testimony—falls short of the relief necessary to remedy the constitutional violation. Specific performance is rarely warranted, and should be imposed only when fairness and equity demand it. As the C.D.O. notes, such a remedy generally should be afforded only under "drastic circumstances where the defendant detrimentally relies on an inducement and cannot be returned to the status quo *ante*."[30] Our disagreement with the C.D.O. arises concerning its view that mere

---

[29]     *See* C.D.O. at 4.

[30]     *Id.* at 9.

suppression of Cosby's deposition testimony will remedy his constitutional harm and "fully" restore him to where he stood before he detrimentally relied upon D.A. Castor's inducement.[31]  This perspective understates the gravity of Cosby's harm in this case, and suppression alone is insufficient to provide a full remedy of the consequences of the due process violation.

The C.D.O. would limit our assessment of the harm suffered by Cosby to the Commonwealth's use of the deposition testimony at his two trials.  But the harm is far greater than that, and it began long before even the first trial.  It must be remembered that D.A. Castor's decision not to prosecute Cosby, and to announce that decision orally and in a written press release, was not designed to facilitate the use of testimony against Cosby in a future criminal trial.  Instead, D.A. Castor induced Cosby's forfeiture of his Fifth Amendment rights as a mechanism and a lever to aid Constand's civil action and to improve the chances that she would receive at least a monetary benefit for the abuse that she suffered, given that D.A. Castor had determined that Constand would not, and could not, get relief in a criminal trial.  Through his deliberate efforts, D.A. Castor effectively forced Cosby to participate against himself in a civil case in a way that Cosby would not have been required to do had he retained his constitutional privilege against self-incrimination.  To say the least, this development significantly weakened Cosby's legal position.  Cosby was compelled to give inculpatory evidence that led ultimately to a multi-million dollar settlement.  The end result was exactly what D.A. Castor intended:  Cosby gave up his rights, and Constand received significant financial relief.

Under these circumstances, where our equitable objective in remedying a due process violation is to restore an aggrieved party to the status he held prior to that violation, exclusion of the deposition testimony from a third criminal trial, and nothing

---

[31]     *Id.* at 5.

more, falls short of what our law demands. Though this appeal emanates from Cosby's criminal convictions, we cannot ignore the true breadth of the due process violation. The deprivation includes the fact that D.A. Castor's actions handicapped Cosby in the derivative civil suit. Nor can we ignore the fact that weakening Cosby's position in that civil case was precisely why D.A. Castor proceeded as he did. Suppression of evidence in a third criminal trial can never restore Cosby to the position he held before he forfeited his Fifth Amendment rights. The consequences of D.A. Castor's actions include the civil matter, and no exclusion of deposition testimony can restore Cosby's injuries in that regard.

It was not only the deposition testimony that harmed Cosby. As a practical matter, the moment that Cosby was charged criminally, he was harmed: all that he had forfeited earlier, and the consequences of that forfeiture in the civil case, were for naught. This was, as the C.D.O. itself characterizes it, an unconstitutional "coercive bait-and-switch."[32] It is the true and full breadth of the consequences of the due process violation that separates this case from the cases relied upon by the C.D.O., including *Stipetich*.[33] Each of those prosecutions involved defective or unenforceable promises that resulted in suppression remedies. Critically, none of them featured the additional harm inflicted in this case. In none of those cases did the effects of the constitutional violation extend to matters beyond the criminal trial, as was the circumstance here. Accordingly, none of those cases support, much less compel, the limited remedy that the C.D.O. proffers.

The impact of the due process violation here is vast. The remedy must match that impact. Starting with D.A. Castor's inducement, Cosby gave up a fundamental

---

[32] *Id.* at 1.

[33] *See* C.D.O. at 6-8 (citing *Stipetich*, *Commonwealth v. Peters*, 373 A.2d 1055 (Pa. 1977); *Commonwealth v. Parker*, 611 A.2d 199 (Pa. 1922); *People v. Gallego*, 424 N.W.2d 470 (Mich. 1988); and *United States v. Blue*, 384 U.S. 251 (1966)).

constitutional right, was compelled to participate in a civil case after losing that right, testified against his own interests, weakened his position there and ultimately settled the case for a large sum of money, was tried twice in criminal court, was convicted, and has served several years in prison. All of this started with D.A. Castor's compulsion of Cosby's reliance upon a public proclamation that Cosby would not be prosecuted. The C.D.O.'s remedy for all of this would include subjecting Cosby to a third criminal trial. That is no remedy at all. Rather, it is an approach that would place Cosby nowhere near where he was before the due process violation took root.

There is only one remedy that can completely restore Cosby to the status quo *ante*. He must be discharged, and any future prosecution on these particular charges must be barred. We do not dispute that this remedy is both severe and rare. But it is warranted here, indeed compelled. The C.D.O. would shun this remedy because (at least in part) it might thwart the "public interest in having the guilty brought to book."[34] It cannot be gainsaid that society holds a strong interest in the prosecution of crimes. It is also true that no such interest, however important, ever can eclipse society's interest in ensuring that the constitutional rights of the people are vindicated. Society's interest in prosecution does not displace the remedy due to constitutionally aggrieved persons.

## IV. Conclusion

We do not question the discretion that is vested in prosecutors "over whether charges should be brought in any given case." *Stipetich*, 652 A.2d at 1295. We will not undermine a prosecutor's "general and widely recognized power to conduct criminal litigation and prosecutions on behalf of the Commonwealth, and to decide whether and when to prosecute, and whether and when to continue or discontinue a case." *Id.* (quoting

---

[34]    *See* C.D.O. (quoting *Blue,* 384 U.S. at 255).

*Commonwealth v. DiPasquale*, 246 A.2d 430, 432 (Pa. 1968)). The decision to charge, or not to charge, a defendant can be conditioned, modified, or revoked at the discretion of the prosecutor.

However, the discretion vested in our Commonwealth's prosecutors, however vast, does not mean that its exercise is free of the constraints of due process. When an unconditional charging decision is made publicly and with the intent to induce action and reliance by the defendant, and when the defendant does so to his detriment (and in some instances upon the advice of counsel), denying the defendant the benefit of that decision is an affront to fundamental fairness, particularly when it results in a criminal prosecution that was foregone for more than a decade. No mere changing of the guard strips that circumstance of its inequity. *See, e.g., State v. Myers*, 513 S.E.2d 676, 682 n.1 (W.Va. 1998) (explaining that "any change in the duly elected prosecutor does not affect the standard of responsibility for the office"). A contrary result would be patently untenable. It would violate long-cherished principles of fundamental fairness. It would be antithetical to, and corrosive of, the integrity and functionality of the criminal justice system that we strive to maintain.

For these reasons, Cosby's convictions and judgment of sentence are vacated, and he is discharged.[35]

Justices Todd, Donohue and Mundy join the opinion.

Justice Dougherty files a concurring and dissenting opinion in which Chief Justice Baer joins.

Justice Saylor files a dissenting opinion.

---

[35] Accordingly, we do not address Cosby's other issue.